OPERATION RESCUE–NATIONAL, Rescue America, Dallas Rescue, Philip L. "Flip" Benham, Bob Jewitt, Keith Tucci, and Don Treshman, Appellants,

v.

PLANNED PARENTHOOD OF HOUSTON AND SOUTHEAST TEXAS, INC., West Loop Clinic, A–Z Women's Health Services, Downtown Women's Clinic, Houston Women's Clinic, Women's Pavilion, Women's Medical Center of N.W. Houston, AAA Concerned Women's Center, Aaron's Family Planning Clinic of Houston, Suburban Women's Clinic, Dr. Jerry Edwards, Dr. Robert P. Kaminsky, Dr. Doug Karpen, Dr. Bernard Rosenfeld, Dr. John Coleman, and Dr. Adebayo Adesomo, Appellees.

No. 14–95–00363–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 19, 1996.

Rehearing Overruled Jan. 23, 1997.

Jay Alan Sekulow, Washington, Cactus Jack Cagle, Houston, James Austin Pinedo, San Antonio, Richard W. Schmude, Tomball, for appellants.

Kathy D. Patrick, Neal S. Manne, Collyn A. Peddie, Houston, for appellees.

---

* The Honorable Ross A. Sears sitting by assignment.

1. Appellants have not raised any points of error attacking the sufficiency of the evidence supporting the jury's findings that they participated in a conspiracy to interfere with the business of the

Before AMIDEI, ANDERSON and SEARS,* JJ.

## MAJORITY OPINION

SEARS, Justice (Assigned).

█ This appeal is from a judgment awarding damages and permanently enjoining appellants, anti-abortion groups and their leaders, from interfering with access to appellees' homes and clinics. Appellees are ten women's clinics and several doctors who sometimes perform abortions. Based upon the jury's findings that appellants were liable for civil conspiracy, tortious interference, invasion of privacy and property rights, the judgment awarded actual and punitive damages to appellee Planned Parenthood of Houston and Southeast Texas, Inc. ("Planned Parenthood"). Appellants, Philip "Flip" Benham and Bob Jewitt, are referred to as "B/J," and appellants, Operation Rescue–National, Rescue America, Dallas Rescue, Don Treshman and Keith Tucci, are collectively referred to as "OR." In separate briefs, B/J raise thirty-seven points of error and OR raise fifty-four points, for a total of ninety-one points of error, many of which overlap. Both groups contend the permanent injunction violates both the Texas and United States Constitutions. They also attack the sufficiency of the evidence to substantiate the trial court's findings supporting the injunctive relief. They complain of errors in the jury instructions, in the composition of the jury, in the amended and corrected judgments, and in the assessment of costs. In addition, OR challenge the sufficiency of the evidence supporting the actual and punitive damages imposed against them.[1] We affirm the judgment of the trial court.

## Background

Appellants sought to interfere with the activities of Planned Parenthood and other family planning clinics in August 1992 during the Republican National Convention in Hous-

clinics or that they and their operatives tortiously interfered with the clinic's business. By failing to allege error in a point of error, any complaint as to these findings has been waived. *San Jacinto River Authority v. Duke,* 783 S.W.2d 209, 210 (Tex.1990).

ton. Don Treshman, the National Director of appellant Rescue America, announced a plan for a concerted, large-scale assault on Houston abortion providers. Treshman met with leaders of Operation Rescue–National before the GOP Convention. The groups agreed to jointly exert pressure on Planned Parenthood and other clinics to force them to close during the Convention. The primary tactic was conducting or sponsoring "rescues" which are blockades of clinics. In addition, Operation Rescue planned to promote residential pickets of physicians who worked at the clinics, and Rescue America was to coordinate information on these pickets. Pat Mahoney, a spokesman for Operation Rescue–National, acknowledged that the two groups had a common purpose and plan and were "all working toward a common goal." Appellants also announced their plan at a press conference.

In response, appellees and others filed suit and obtained a temporary restraining order (TRO) preventing appellants from coming within a 100–foot "buffer zone" of appellees' clinics and homes. Appellants Tucci, Benham and Jewitt, along with others who are not parties to this appeal, intentionally violated that part of the TRO barring demonstrations within the 100–foot zone around the clinics' entrances and exits, and they were jailed. All sought habeas relief, which the Texas Supreme Court granted. The supreme court held that the TRO imposing a 100–foot speech-free zone around the clinics' entrances and exits violated the protestors' constitutional right to freedom of expression because there was no showing the zone was the "least restrictive" means of protecting the clinics from harm. *Ex parte Tucci,* 859 S.W.2d 1, 7 (Tex.1993) (plurality opinion).

Appellees then amended their pleadings, sought a permanent injunction, and Planned Parenthood later asked for actual and punitive damages. Following a six-week jury trial and a two-day evidentiary hearing on the particulars of the proposed injunctive relief, Judge Eileen O'Neill of the 190th District Court signed a Judgment and Permanent Injunction on December 5, 1994. The judgment awarded the following damages to

Planned Parenthood, plus pre- and post-judgment interest:

> **$204,585 in actual damages** from Operation Rescue–National, Rescue America, Don Treshman, and Keith Tucci, jointly and severally; plus punitive damages as follows: $350,000 from Operation Rescue–National; $355,000 from Rescue America; $155,000 from Don Treshman; and $150,000 from Keith Tucci, for **a total of $1,010,000 in punitive damages.**

The judgment permanently enjoined and restrained appellants from interfering with the clinics, harassing the physicians and their family members, and demonstrating within a specific zone as to each clinic and doctor's residence. These zones range from fifteen feet to thirty-two feet around the entrances to the clinics and are outlined on maps attached to the injunctive order. The demonstration-free zones also extend thirteen feet from the property line in front of each physician's residence. The judgment incorporates the trial court's findings of fact and conclusions of law as to the injunctive relief.

After entry of the judgment, the cause was transferred to the 333rd District Court, where Judge Richard Bianchi signed an Amended Judgment and Permanent Injunction on February 1, 1995, to correct two errors in the judgment. Subsequently, on June 15, 1995, the same court entered a Judgment Nunc Pro Tunc and Permanent Injunction to include the attachment of exhibits inadvertently omitted from the Amended Judgment. This appeal resulted.

### Jury Composition

■ In their points forty-six and forty-seven, OR contend the trial court erred in refusing to strike certain jurors for cause, requiring them to use all of their peremptory challenges and accept jurors they found objectionable. B/J raise the same complaints in their points twenty-nine and thirty.

■ To preserve error in the trial court's failure to strike objectionable jurors, the complaining party must timely bring its complaint to the trial court's attention before making its peremptory challenges. *Hallett v. Houston Northwest Medical Center,* 689

S.W.2d 888, 889–90 (Tex.1985). The objecting party must specifically inform the trial court which objectionable jurors will remain after all peremptory strikes are made, and this notice must be given before the actual exercise of the strikes. *Id; see also Beavers v. Northrop Worldwide Aircraft Services, Inc.,* 821 S.W.2d 669, 673 (Tex.App.—Amarillo 1991, writ denied); *Carpenter v. Wyatt Constr. Co.,* 501 S.W.2d 748, 750–51 (Tex.Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.).

In this case, after the trial court excused several potential jurors for cause, the court overruled appellants' challenges for cause as to twenty-one additional venire members. The parties then made their peremptory strikes. Appellants did not object to the trial court's denial of their challenges for cause until after all parties had exercised their peremptory strikes and the jury was about to be sworn. They argued that two jurors about to be impaneled were objectionable and would have been challenged peremptorily if they could have done so. They then listed seven jurors on whom they would have used a peremptory strike, but they failed to fully articulate their objection and obtain a ruling. In addition, appellants did not seek additional peremptory challenges. By failing to object to the trial court's refusal to strike objectionable jurors until after the peremptory strikes were made, appellants have waived error, if any. B/J's points twenty-nine and thirty and OR's points forty-six and forty-seven are overruled.

### Charge Error

In B/J's points of error four through seven and OR's points one through seven, appellants complain about alleged errors in Jury Instruction No. 2, which provided in relevant part:

"*Civil conspiracy*" means a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. To find a civil conspiracy, you must find the following:

1. a combination of two or more persons,
2. who agree or have a meeting of the minds on a common purpose or course of action,
3. who have knowledge of the purpose or course of action, and
4. at least one of such persons commits at least one act to further the conspiracy.

"Unlawful" means violative of either criminal or civil law.

■ The trial court has broad discretion in submitting explanatory instructions and definitions. *Wisenbarger v. Gonzales Warm Springs Rehab. Hosp., Inc.,* 789 S.W.2d 688, 692 (Tex.App.—Corpus Christi 1990, writ denied). Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and they aid the jury in answering the questions in the charge. Tex.R. Civ. P. 277, 278.

■ To preserve error in the jury charge, a party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling. *State Dept. of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex. 1992); Tex.R. Civ. P. 274. A party is required to object when the court submits an erroneous question, instruction or definition. Tex.R. Civ. P. 274; *see, e.g., Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994). Objections must be made before the charge is read to the jury. *Missouri Pac. R.R. Co. v. Cross,* 501 S.W.2d 868, 873 (Tex.1973); Tex.R. Civ. P. 272. If a submitted instruction is erroneous, it does not matter which party has the burden of proof. *Religious of the Sacred Heart v. City of Houston,* 836 S.W.2d 606, 613–14 (Tex.1992). A written request is required only when a question, instruction or definition is omitted. Tex.R. Civ. P. 278.

■ Appellants contend the trial court's instruction on conspiracy is erroneous because it does not include a requirement that the acts to further the conspiracy be "overt" and "unlawful." In addition, they contend the instruction is fatally flawed because it failed to include a requirement that there be damages proximately resulting from the conspiracy.

■ We reject appellees' contention that appellants failed to properly preserve all of its complaints about the charge. At the charge conference, appellants objected that

the instruction did not require an "unlawful overt act" and that there was no element of damages included in the cause of action. The attorney representing Benham and Jewitt objected to the definition in Instruction No. 2, and tendered another definition, which was refused. The parties stipulated at trial that objections made by one defendant were applicable to the others. Appellees contend Rescue America and Treshman have waived any complaint as to the conspiracy definition because their attorney did not receive a ruling. However, when an objection is made and the court made no change in the charge, it is presumed that the objection was properly and timely presented and that the objection was overruled. *Acord v. General Motors Corp.*, 669 S.W.2d 111, 114 (Tex.1984); Tex.R. Civ. P. 272. In addition, appellants were only required to object to an erroneous instruction to preserve error; they were not required to submit a substantially correct instruction. Therefore, the fact that appellants' tendered question also omitted the term "unlawful" is not fatal to preservation of their challenge on appeal.

However, we do agree that appellants failed to preserve error alleged in OR points three through seven and B/J points six and seven. In these points, appellants complain that the defective definition of conspiracy infected the jury's answers on liability and damages in Question Nos. 1 through 4 and 6 through 10. No objections were made by any defendant to these questions because of the allegedly erroneous conspiracy definition. A party cannot enlarge on appeal an objection made in the trial court. *Conner v. Bean*, 630 S.W.2d 697, 701 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). An objection on appeal that is not the same as that urged at trial presents nothing for review. *Holland v. Hayden*, 901 S.W.2d 763, 765 (Tex. App.—Houston [14th Dist.] 1995, writ denied). Nor can a party raise a new objection for the first time on appeal. *See* Tex.R.App. P. 52(a); Tex.R. Civ. P. 274. We overrule OR's points three through seven and B/J's points six and seven.

First, as to the alleged failure to include a damages element in Instruction No. 2, we note that Question No. 3 asked: "Did any of the Plaintiff Clinics, Plaintiff Physicians, or Intervenors suffer injury, harm, or damages that were proximately caused by the conspiracy?" Question No. 3 was predicated on an affirmative answer to the liability questions on conspiracy to interfere with the business, privacy or property rights of appellees. Rule 277 expressly permits predication of damage questions on affirmative findings on liability. Tex.R. Civ. P. 277. We hold that the trial court did not err in submitting damages separately.

The Texas Supreme Court has repeatedly defined a civil conspiracy as "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex.1996); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). The definition in this case is identical. The elements of the cause of action must be taken in the context of this basic definition stating that the object to be accomplished, or the means by which it is accomplished, is unlawful. *Triplex Communications*, 900 S.W.2d at 720; *Massey*, 652 S.W.2d at 934. The "gist of a civil conspiracy" is the injury that is intended to be caused. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968).

In *Massey*, the Supreme Court listed the essential elements of civil conspiracy as: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey*, 652 S.W.2d at 934. The instruction in this case is substantially the same, except that it requires the jury to find "at least one act to further the conspiracy." When the elements submitted in this case are considered in the context of the basic conspiracy definition, we find no error in this slight deviation from the *Massey* elements. According to the court's instruction in this case, the jury was required to find an act furthering appellants' "unlaw-

ful purpose," or an act forming the "unlawful means" of accomplishing their conspiracy.

■ In addition, while not every act of protest described at trial was illegal, it was uncontroverted that one or more of appellants' actions were unlawful. The charge defined "unlawful" as "violative of either criminal or civil law." Appellants admitted many of their actions, at the very least, violated appellees' common law rights as well as the initial injunctive order. There is also no dispute that the actions at issue in this case were "overt." It was therefore established that some appellants committed overt, unlawful acts, and the only *disputed* issue was whether these acts were part of a conspiracy so that each co-conspirator is responsible for all acts done by any of the conspirators. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979). Since only the *disputed* issues must be submitted, the trial court was not required to submit the element of an "overt, unlawful" act. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex.1992) (holding that only disputed issues must be submitted to the jury); *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex.1988) (same); *Kiel v. Brinkman*, 668 S.W.2d 926, 929 (Tex.App.—Houston [14th Dist.] 1984, no writ) (holding that the trial court did not err in submitting only one of three required elements when the other two were not disputed). We hold that the court's instruction, together with the damages questions, sufficiently encompassed the elements of conspiracy in this case.

■ When error in the charge is found, we must review the pleadings, evidence, and the entire charge to determine if the error is harmful. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). To reverse based on error in the charge, appellants must establish that the error amounted to such a

denial of their rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP. P. 81(b)(1). Here, the evidence supporting conspiracy to commit illegal acts, as well as the commission of illegal acts, was overwhelming.[2] Based on the testimony of the appellants and their admitted, illegal overt acts, the jury found appellants tortiously interfered with the clinics' business and violated the physicians' privacy rights. Therefore, even if we were to find that the trial court erred in its instruction on the conspiracy definition, we would find the error to be harmless.

In conclusion, we find no reversible error in the court's charge on conspiracy. B/J's points of error four and five and OR's points one and two are overruled.

■ Appellants also complain about the omission of a question or instruction on imminent harm relating to the injunctive relief in B/J point of error twenty-eight and OR point forty-five. The Texas Supreme Court has determined that the question of imminent harm is not a proper issue to submit to the jury, but instead is a question for the court to decide as a court of equity. *State v. Texas Pet Foods*, 591 S.W.2d 800, 804 (Tex. 1979). Although a litigant has a right to trial by jury in an equitable action, only ultimate issues of fact are submitted for the jury's determination. *Id.* We overrule B/J point of error twenty-eight and OR point forty-five.

### Injunctive Relief

■ To be entitled to permanent injunctive relief, the plaintiffs must plead and prove a valid cause of action against the defendants. *See Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex.1993) (holding that because Texas has no cause of action for negligent infliction of emotional distress, the trial court improperly entered a permanent in-

---

**2.** We note that in addition to violations of civil law, as well as local and state criminal laws appellants may have violated, their actions would now also be violative of federal law. In 1994, the federal government passed the Freedom of Access to Clinic Entrances Act. 18 U.S.C.A. § 248 (West 1996) (applicable to conduct occurring on or after May 26, 1994). This Act was prompted by the violence at abortion clinics all

over the United States, and it is aimed directly at these appellants and their other conspirators who blockade abortion clinics or threaten employees or patients. The Act makes it a crime to interfere "by force or threat of force *or by physical obstruction*" with anyone who is seeking or performing an abortion or other reproductive health service. 18 U.S.C.A. § 248(a)(1) (emphasis added).

junction enjoining residential picketing). The plaintiffs must show that harm is imminent. *Henderson v. KRTS, Inc.*, 822 S.W.2d 769, 773 (Tex.App.—Houston [1st Dist.] 1992, no writ). They must also establish that this imminent harm will be irreparable if the injunction is not issued. *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666 (Tex.App.—Houston [14th Dist.] 1991, no writ).

Appellants present a two-pronged attack on the injunctive relief granted by the trial court. First, we address their contention that the evidence is insufficient to support the injunctive relief granted by the trial court. Secondly, we consider appellants' contention that the permanent injunction violates both the United States and Texas Constitutions.

### A. Sufficiency of the Evidence

■ Appellants attack the sufficiency of the evidence supporting the injunctive relief and the trial court's findings and conclusions. In response, appellees first assert that appellants have waived every factual sufficiency point of error, and any objection that damages were excessive, by failing to bring a *separate* point of error complaining of the trial court's overruling of their motion for new trial. To preserve error on factual sufficiency complaints, a party must include an objection in a motion for new trial. *See* Tex.R. Civ. P. 324(b)(2), (b)(4); *Luna v. Southern Pacific Transp. Co.*, 724 S.W.2d 383, 384 (Tex.1987). Appellees argue that appellants must complain of the overruling of a motion for new trial by point of error when the objection, such as an objection to the factual sufficiency of the evidence, is made for the first time in the motion for new trial. Appellees cite no case authority directly on point, relying only on *O'Connor's Texas Rules * Civil Appeals* (1993). We find no other authority requiring such a strict interpretation of the briefing rules. We hold the filing of a motion for new trial, raising specific points in the motion as to the sufficiency of the evidence supporting the jury's answers, as appellants did in this case, is effective to preserve error for factual sufficiency points. A separate point of error complaining of the overruling of the motion for new trial is duplicitous and unnecessary.

■ When a party attacks a finding concerning an issue upon which it did not have the burden of proof, it must demonstrate that there is insufficient evidence to support the adverse finding. *See Hickey v. Couchman*, 797 S.W.2d 103, 109–10 (Tex.App.—Corpus Christi 1990, writ denied). The test is whether, after examining all the evidence, the evidence supporting the finding is so slight, or the evidence against it so strong, that the finding is manifestly unjust and clearly wrong. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ The trial court's findings of fact have the same force and dignity as a jury's verdict upon jury questions and are reviewable for sufficiency of the evidence by the same standards as are applied in reviewing the evidence supporting the jury's answers. *Zieben v. Platt*, 786 S.W.2d 797, 799 (Tex. App.—Houston [14th Dist.] 1990, no writ); *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). Although the court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Dallas County v. Sweitzer*, 881 S.W.2d 757, 763 (Tex.App.—Dallas 1994, writ denied).

■ Any ultimate fact may be proven by circumstantial evidence. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 285 (Tex.1995). Because of its nature, proof of a conspiracy usually must be made by circumstantial evidence. *King v. Acker*, 725 S.W.2d 750, 755 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Carr v. Hunt*, 651 S.W.2d 875, 882 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). The jury was instructed in this case that:

A fact may be established by direct or by circumstantial evidence. A fact is established by direct evidence when proved by documentary evidence or by [a] witness who saw the act done or the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Appellants contend the evidence is insufficient to support the jury's finding that appellants conspired to violate, or actually violated, the doctors' privacy or property rights. They also argue the evidence is insufficient to support a finding of imminent harm to the doctors. In OR points of error eight through twenty-four, they assert the evidence is insufficient to show that appellants will engage in the enjoined activity in the future or that there was imminent risk of harm as to physician appellees. B/J essentially make the same argument in points eight through twenty. In points twenty-five through thirty, OR challenge each of the trial court's findings of fact supporting the permanent injunction. B/J's corresponding points are points twenty-one through twenty-six. The court's findings as to the injunctive relief are as follows:

1. Defendants' conduct threatens access to plaintiff clinics by women seeking abortion and other medical services;

2. Defendants' conduct threatens the use and enjoyment of plaintiff clinics' and physicians' property rights;

3. Defendants' aggressive and harassing manner of protesting and sidewalk counseling of clinic patients increases the medical risks attendant to the abortion procedure;

4. Defendants' targeted picketing of plaintiff physicians' homes threatens and interferes with plaintiff physicians' rights of privacy;

5. Defendants have not abandoned their activities toward plaintiffs, but (1) remain committed to their particular protest tactics and would use them again toward plaintiffs if the circumstance (such as a national media event in Houston) presented itself; (2) have aided and abetted others in continuing to engage in conduct that is either tortious or in violation of plaintiffs' constitutional rights; and (3) principle defendants, and those found by the jury to have acted with malice, are either locally based (such as Rescue America and Don Treshman) or have recently increased their organizational presence in Texas (Operation Rescue–National);

6. Despite existing injunctions imposing place and manner restrictions on defendants' protest activities targeting plaintiff clinics, defendants (or those found by the jury to be acting in concert with them) have continued to engage in protest activity toward some of the clinics using tactics that are harassing to patients and clinic staffs, that are violative of plaintiff clinics' common law and constitutional rights, and that threaten safe, accessible abortions for women seeking medical services at plaintiff clinics.

Appellants also attack the sufficiency of the evidence supporting the trial court's first conclusion of law in B/J point twenty-seven OR point thirty-one. They argue that because the findings are erroneous, the court's conclusion cannot stand because it is without a factual base. Conclusion of Law No. 1 states:

Absent injunctive relief, defendants are likely to continue to engage in the tortious conduct found by the jury to be in violation of plaintiff clinics and physicians' common law and constitutional rights, and such conduct is likely to cause plaintiff clinics and physicians irreparable harm.

Appellants argue the evidence is insufficient to support the injunction because appellees called only three witnesses to testify at the hearing on the injunctive relief, and these witnesses did not provide testimony relevant to the standard for determining the necessity for and nature of constitutionally permissible injunctive relief. Our review of the record, however, reveals evidence of the conspiracy to interfere with the business, property and privacy rights of appellees, which threatened imminent, irreparable harm.

In addition to the evidence adduced at the hearing on the injunction, ample evidence supporting the injunctive relief was provided at the jury trial. The record contains evidence of appellants' interference with business, privacy and property rights, which is relevant to the harm element necessary for the permanent injunction. Appellees presented evidence that from early 1992 up to

and including the time of trial, appellants engaged in blockades and used aggressive "sidewalk counseling" by yelling, screaming and following patients at the clinics. The jury saw numerous videotapes and photos of blockades at the clinics during the Convention. At times during the Convention there were estimated to be a thousand people outside Planned Parenthood. Judy Reiner, Planned Parenthood's Deputy Director, Dr. Jerry Edwards, an appellee, and Larissa Lindsay, a clinic escort, all testified they saw appellants and those operating at their direction attempting to or successfully impeding or preventing clinic access. Reiner testified that it was obvious the protests were organized and that the large numbers of people were not appearing spontaneously. Reiner testified she saw Keith Tucci, the former national director of Operation Rescue, outside her clinic several times. Reiner testified the protesters were not peaceful, but instead attempted to block patients' access to the clinic. They got within inches of the patients' faces and often touched them. She told how "escorts" had to form a human circle around patients to get through the mobs to the entrance during large protests. She described the patients' and staff's attempts to gain access to the clinics "like running a gauntlet."

Reiner testified Planned Parenthood has had bomb threats, defacement of the building, thrown bottles and rocks, the locks glued shut, and two butyric acid attacks. She described an invasion at Planned Parenthood that occurred in 1989 or 1990 for which Treshman claimed credit. The protesters entered Planned Parenthood and chained their necks to cement blocks. Daniel Scott, a Planned Parenthood employee, testified he fears being shot every time he leaves the building. Jesse Miller, a protester associated with Rescue America, told Scott in March 1994, "This is the day you die, brother." Reiner testified that Planned Parenthood and the other clinics and physicians took seriously the threats made by Tucci and Treshman and those who work under their direction. She testified to the repairs made to the building and measures taken to safeguard the building, staff and patients.

Don Treshman testified about the aggressive sidewalk counseling promoted by Rescue America and discussed rescues or blockades conducted at the plaintiff clinics. Although Treshman did not participate, his publication, Rescue America's Newsline, advertised a picket at Dr. Kaminsky's house. Treshman invited Rev. Michael Bray, who advocated justifiable homicide of abortionists, to speak at a Rescue America conference in the summer of 1993. Treshman acknowledged that Rescue America will use any methods it deems necessary to save unborn children. The jury saw the videotaped confession of Joshua Graff, admitting he "interfered" with the operation of the West Loop Clinic by trying to blow it up. Treshman admitted that the technique Graff used to firebomb the West Loop Clinic was virtually identical to the one he described in detail on his hotline. Tucci wrote to followers on Operation Rescue letterhead, "if you believe abortion is murder, act like it's murder."

Many of those engaged in protest activities, such as Tom Wieghard and Rusty Thomas, advertised themselves as members of Operation Rescue by wearing its T-shirts. Both told Reiner they acted on behalf of Operation Rescue. Thomas was shown on a video shouting "Murderer" at a protest. John Moloney, described as a Rescue America operative, testified that the common goal of those he worked with was to end abortion by preventing women from going inside the clinics and by preventing physicians from performing abortions. Moloney was seen at clinic protests hundreds of times and also conducted many residential pickets. At these protests, Moloney was seen directing Daniel Ware, who was later arrested on weapons charges for carrying prohibited firearms in his car.

The physicians testified that appellants' actions negatively affected their patients' mental and physical health and made medical procedures more risky. In addition, they testified about the protests at their homes. Dr. Jerry Edwards testified his home had been picketed twelve or fifteen times, the picketing continued after the Republican Convention up to "last weekend." He testified that protesters bring signs, come into his

yard, play loud music, yell and make threats. Photographs were admitted showing the protesters at his residence. He testified he and his young daughter received death threats. He testified he did not feel comfortable at his home and had placed it for sale. He also described protest activities at Planned Parenthood, where he worked as medical director. These activities interfered with his ability to work and caused stress to his patients. Judy Reiner of Planned Parenthood testified she was present at two pickets at the homes of Drs. Edwards and Rosenfeld and saw people associated with Rescue America. She did not see Treshman, Tucci, Benham or Jewitt, however.

Dr. Robert Kaminsky testified his office, Women's Medical Center of Northwest Houston, is picketed regularly. He saw Treshman picket there about five times. He testified James Doyle followed him in his car once. The previous Saturday his business was significantly interfered with by picketers. He testified the activities of protestors pose a health risk to his patients. His house has been picketed about two dozen times. A "Wanted" poster with a photograph of Dr. Kaminsky was used during the picketing. Mrs. Kaminsky testified their home had been picketed about fifteen times, the last time on the previous Saturday. Mrs. Kaminsky also testified she does not feel safe because the protesters follow them to work. Mrs. Kaminsky testified she saw several of Treshman's followers outside both her home and her husband's office several times. She could identify Treshman's followers because she saw them taking direction from him or from John Moloney. She saw John Moloney and James and Estelle Pratt picket their home. She had also seen the Pratts and James Doyle with Treshman in front of their office. A videotape of picketing at the Kaminsky residence was introduced into evidence. On the tape, Moloney shouted at Mrs. Kaminsky, "there is a just punishment that you deserve.... This is just a small taste of what's coming down the pike. We trust we won't have to do it." She described that picket as a "huge shoving match." She testified John Moloney grabbed her, and her teenage daughter was pushed to the ground by activists in her front yard. This incident occurred shortly after Dr. David Gunn was murdered outside an abortion clinic in Pensacola, Florida while a Rescue America-sponsored picket was taking place, and Mrs. Kaminsky testified she feared for her husband's safety. She did not want her husband to come outside during the confrontation with the picketers, but he eventually helped his wife and daughter return to the house. Mrs. Kaminsky testified the event was very scary and upsetting. She described it as "the most terrifying thing I've ever been through." A few days later, Treshman praised Moloney for the Kaminsky picket on his hotline.

Dr. Doug Karpen testified he had seen Treshman at clinic demonstrations and had met him at Hobby Airport, where Treshman and five others followed him. Treshman and Benham admitted monitoring and following Dr. Karpen in a joint effort with Dallas Rescue for more than six weeks. Dr. Karpen practices at Aaron's Women's Clinic and at Women's Pavilion. He testified protestors had tried numerous time to block access at Aaron's, including an attempted blockade during the Republican Convention and an actual blockade about that time, organized by Operation Rescue and Treshman. There were two attempted blockades at The Women's Pavilion during the Convention. Dr. Karpen's house had been picketed about three to four times, but not within the past two and a half years.

Dr. Bernard Rosenfeld testified demonstrations occur every Saturday at the Houston Women's Clinic where he works. The clinic had been subjected to acts of vandalism, including acid attacks, gluing of door locks, and flooding of his clinic. Many patients had been accosted by protestors and had been "extremely stressed out," making the medical procedures "much more dangerous." Dr. Rosenfeld testified that his house has been picketed about six to eight times and his driveway has been blockaded by protesters. This activity interfered with his ability to work and terrorized his wife and children. The activists told his three and four-year old children, "Your daddy kills babies." Photographs were admitted showing the protesters at his residence.

Dr. Adebayo Adesomo testified Don Treshman of Rescue America was the leader of the protesters at his office at Suburban Women's Clinic during the Republican Convention. Treshman denied he was the leader of that protest, and claimed he only went there to talk to the press. Dr. Adesomo admitted his house had not been picketed. He testified that he was aware that an anti-abortion protester who was an admitted follower of Rescue America had killed a physician working at an abortion clinic, and he feared the same fate could happen to anyone performing abortions.

Dr. Coleman died before trial, and his deposition was not taken. He worked at A–Z Women's Health Services and at the West Loop Clinic. The evidence was that his house had been picketed several times. Treshman admitted he "organized, conducted and announced" a picket at Dr. Coleman's funeral.[3]

The evidence from the hearing on the injunctive relief is directed to the issue of irreparable harm and is summarized as follows.

Dr. Morris Taggart, a psychologist, testified about the emotional impact of picketing on patients and staff. He interviewed eight employees of Planned Parenthood. He characterized the reactions of those he interviewed as those of "people having undergone some kind of trauma." The workers reported being physically jostled on arrival at the clinic, and they were yelled at with cries of "baby murderer." The staff was upset and unable to work after these incidents. In Dr. Taggart's opinion, a buffer zone banning "harassing speech" was necessary because of the distress to staff and patients. He testified restrictions are necessary most importantly to prevent physical contact, but also to reduce the proximity of the yelling and screaming. He admitted that on four visits to the Planned Parenthood clinic, he observed only "peaceful protests."

Dr. Dale Hill, also a psychologist, interviewed three patients, three nurses, one doctor and one volunteer in January 1994. In her testimony, she described the encounters with protesters. The patients and staff reported being "hollered at" and "physically transgressed." Some received threats, such as, "You need to die." She concluded protesting was harmful to patients and staff, and a buffer zone is necessary to protect them from psychological and emotional trauma. She observed protests at Planned Parenthood, but never observed any violence at the protests. Her own ingress or egress was not blocked during her three trips to Planned Parenthood.

Laura Lindsay, a Planned Parenthood employee, primarily introduced photographs and diagrams of the clinics setting forth the requested buffer zone areas. She demonstrated through photographs that signs held outside the buffer zones could still be read. She admitted there are numerous differences about the clinics as to the level of traffic, noise, parking, or whether the clinic is in a residential area as opposed to downtown Houston. She acknowledged that, since the 1992 Republican Convention, Planned Parenthood has constructed a wall higher than six feet and a private enclosed drive provides access to the entrance door.

Appellants called Mary Hall Kleypass, a pro-life "sidewalk counselor." She testified she approaches women considering abortion and offers literature about the "development of the baby as well as a place where she could go for help." To be successful, "sidewalk counseling" involves "direct interaction" with the women, using "eye contact." She denied she uses intimidation or grabs anyone, but instead counsels "gently and quietly." She testified that counseling could not be done from across the street because she would be forced to yell and could not interact with the women. However, on cross-examination Kleypass admitted she is not a party to this case, does not know most of the appellants, does not act in concert with them, and is not subject to the injunction.

■ The party seeking an injunction must establish the defendant "will engage in

---

**3.** Even though appellants allege four points of error challenging the sufficiency of the evidence supporting the jury's finding that appellants violated Dr. John Coleman's rights, the finding is immaterial because Dr. Coleman was awarded no damages and obtained no injunctive relief.

the activity enjoined." *State v. Morales,* 869 S.W.2d 941, 946 (Tex.1994). Appellants argue there is no evidence of imminent harm because the spotlight of national politics has moved from Houston and most of the individual defendants have left Houston. They contend that all individuals except Flip Benham, who lives in Dallas, reside out of state. According to appellants, there is no continuing threat of irreparable harm.

We disagree. The evidence at trial shows that appellants Treshman and Rescue America are Houston-based. Appellant Operation Rescue has operatives here. Operation Rescue and its leaders directed and controlled the activities of sympathetic followers in Houston. There was evidence presented at trial that Daniel Ware, Tom Weighard, Rusty Thomas, John Byrd, C.D. Money, Jesse Miller, and other persons in Houston act at the direction or control of appellants in harassing, threatening and interfering with appellees. Tom Wieghard, a member of Operation Rescue, signed Operation Rescue's pledge "to follow the mission's leadership" and engage in its activities "as directed." Weighard admitted his intention was to interfere with Planned Parenthood's business. He admitted he supervised and instructed "anyone who was out there" in front of the clinics, including Joshua Graff, and that he assisted at the blockade of the A–Z Clinic. He testified he had been taught techniques for these activities by coordinators for Operation Rescue–National. Jeff White, director of Operation GOP ("Guard Our Preborn"), the name given the protest activities during the Convention, announced that after the Convention, Operation Rescue "had left behind a thriving pastor-lead rescue community in Houston."

None of the appellants testified that they were willing to stop their activities. Most expressed a clear intention to violate any court order that interfered with their activities. Pat Mahoney of Operation Rescue testified to holding a "Boston Tea Party" where he publicly destroyed a copy of Judge O'Neill's initial TRO and said he would do the same thing again. Flip Benham, national director of Operation Rescue, testified he intended to continue his activities. He testi-

fied that Operation Rescue will "live out its gospel in the streets despite injunctions and court orders." Operation Rescue literature makes it clear that "[t]he threats of rescues will hang over the killers' heads every day." Treshman testified Rescue America intends to continue to blockade clinics, "continue to use any effective means we feel will save lives," continue residential picketing, and "continue all activities and all avenues that are effective in stopping the abortion Holocaust." Bob Jewitt wrote to Operation Rescue supporters that "[t]hose of us included in the injunction admitted that we already had an injunction from God to rescue children no matter how the judge would rule." Keith Tucci, former national director of Operation Rescue, wrote, "[n]o matter what the laws say, we are committed to keep rescuing children." He stated in another letter "we will continue our ... direct action...." Reiner testified the protests continued through her testimony at trial.

In making its determination of imminent harm, the trial court may determine that, when violations are shown up to or near the date of trial, the defendant has engaged in a course of conduct and the court may assume that it will continue, absent clear proof to the contrary. *Texas Pet Foods,* 591 S.W.2d at 804. The probability of the continuation of the prohibited practices is not subject to direct proof, and injunctive relief is proper when the trial court finds it justified under the rules of equity, notwithstanding a defendant's cessation of the activity or promise to cease the activity. *Id.* Here, there was evidence that threats of violence, interference, and invasion of personal and property rights continued up to and during trial. There was no "clear proof to the contrary."

Under Texas law, a violation of a constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief. *Southwestern Newspapers Corp. v. Curtis,* 584 S.W.2d 362, 368 (Tex.Civ.App.—Amarillo 1979, no writ); *see also Iranian Muslim Organization v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981). In addition, disruption of business constitutes the type of harm for which an injunction may issue. *Liberty Mut. Ins. Co.,* 812 S.W.2d at 666.

When faced with similar facts, this court found that violation of a clinic lessee's constitutional property rights caused irreparable harm. *Right to Life Advocates, Inc. v. Aaron Women's Clinic,* 737 S.W.2d 564, 571 (Tex.App.—Houston [14th Dist.] 1987, writ denied), *cert. denied,* 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 47 (1988). When the clinic faced a continuation of picketing and harassment by abortion protesters, we determined that a suit for money damages for loss of business was insufficient, and the only adequate remedy was an injunction limiting the protests. *Id.*

In this case, when the jury inquired whether it had to determine that each appellant personally violated the physicians' privacy and property rights, the court instructed that it could "consider the acts of non-defendants if those persons committed the act, if any, as agents of the listed Defendants. An agent is one who consents to act on behalf of and subject to control of another, the principal, who has manifested consent that the agent shall so act." Appellants make no complaint on appeal as to this instruction. Therefore, we conclude that it is immaterial that each of the individual appellants were not identified as personally engaging in many of the protest activities. It is not essential that each conspirator be shown to have acted in concert with his co-conspirators. *See Bourland v. State,* 528 S.W.2d 350, 354 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.). Once a civil conspiracy is proven, each conspirator is responsible for the acts done by any other conspirator to further the conspiracy. *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 926 (Tex.1979).

We find sufficient evidence for the jury to have concluded that the participants in the illegal protests followed the direction of Operation Rescue and Rescue America and their leaders. While appellants denied they organized the protests, many of their denials were impeached by their own writings and deposition testimony. The jury, as the sole judge of the credibility of the witnesses and the weight to be given to their testimony, was free to disregard the testimony of any witness and resolve inconsistencies in the testimony. *McGalliard v. Kuhlmann,*

722 S.W.2d 694, 697 (Tex.1986); *Skrepnek v. Shearson Lehman Bros., Inc.,* 889 S.W.2d 578, 579 (Tex.App.—Houston [14th Dist.] 1994, no writ).

We conclude that the evidence is sufficient to support the jury's finding that appellants conspired to violate, and did violate, the privacy and property rights of the physicians. In addition, the evidence is factually sufficient to support the trial court's findings in granting the requested injunctive relief both as to the clinics and in favor of the physicians. The contrary evidence is not so overwhelming as to render the court's judgment unjust. Therefore, we also conclude that the trial court's conclusion of law in support of the necessity of the injunction is not erroneous. We overrule OR's points of error eight through thirty-one and B/J's points eight through twenty-seven.

## B. Constitutional Complaints

In B/J point one and OR point forty-three, appellants contend the permanent injunction order is void because it violates the right to freedom of speech guaranteed in the First Amendment of the United States Constitution, as construed in *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). They also contend the injunction is unconstitutionally overbroad in violation of the First Amendment rights of freedom of speech, press and association in B/J point three and OR point forty-four.

In *Madsen,* the United States Supreme Court set forth the standard for evaluating the constitutionality of a content-neutral injunction such as the one at issue here. We must determine "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. at 2525. This standard is based on the Court's earlier pronouncement that when sanctionable "conduct occurs in the context of constitutionally protected activity ... 'precision of regulation' is demanded." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982).

In B/J point two and OR point forty-two, appellants also complain the injunction violates the Texas constitution and is not the least restrictive means of protecting the governmental interests involved, in violation of *Ex parte Tucci*, 859 S.W.2d 1 (Tex.1993) (plurality opinion). The Texas Constitution's broad command that "[e]very person shall be at liberty to speak ... opinions on any subject" provides greater rights of free expression than the First Amendment of the United States Constitution. *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex.1992) (citing TEX. CONST. art. I, § 8). For this reason, restraints on expression may be imposed only if the injunctive relief granted encompasses "the least restrictive means" of protecting against the alleged imminent and irreparable harm caused by the expression. *Tucci*, 859 S.W.2d at 6.

The Texas Supreme Court recognized in *Tucci* that constitutional protection of freedom of speech and assembly does not license obstruction of public ways or entrances and exits from places of business. *Tucci*, 859 S.W.2d at 4. Without unimpaired access to appropriate counseling and medical facilities, women are deprived of their constitutional guarantee of choice. *Id.*

In *Tucci*, the supreme court considered only the portion of the temporary restraining orders on which the contempt convictions were based and which barred:

> Demonstrating within one-hundred (100) feet from either side of or in front of any doorway entrance or exit, parking lot, parking lot entrance or exit, driveway, or driveway entrance or exit at [any of the] clinic[s] or parking lots.

*Id.* at 4–5. In striking down the 100–foot speech free zone, the supreme court found the limited record before the trial court did not support the ban and noted that although a map of the Planned Parenthood facility was referred to at the hearing on the restraining orders, no evidence was admitted as to the different physical facilities of the various clinics. *Id.* at 6. Instead, those seeking the restraint urged a uniform restriction for "administrative convenience." *Id.* The court left open the possibility of a permanent injunction imposing a limited geographical ban

on activity as long as any restriction is "justified by a proper evidentiary showing that such measures are essential to preserve the right of clinic access, and that each satisfies fully the standard we have required under the Texas Constitution." *Id.* The court required "specific findings supported by evidence" that the speech-free zone is the least restrictive means to insure unimpeded access to clinics and guard against intimidation and harassment. *Id.*

While we recognize that our supreme court has held that the Texas constitution generally provides greater free speech rights than those provided under the federal constitution, we conclude that the standards of review for the constitutionality of this injunction are essentially the same under both the United States Constitution and the Texas Constitution. Any buffer zone injunction must "burden no more speech than necessary" and be the "least restrictive means" to protect unimpeded access to the clinics and residences.

In *Madsen*, the United States Supreme Court considered the constitutionality of a state court injunction prohibiting anti-abortion protestors, including Operation Rescue and "Operation Rescue America," from demonstrating outside a health clinic in Florida. Among other restrictions, the injunction prohibited the protestors, from "congregating, picketing, patrolling, demonstrating or entering" any portion of the public right-of-way or private property within 36 feet of the property line of the clinic to ensure access to the clinic. *Madsen*, 512 U.S. at 768, 114 S.Ct. at 2526. In upholding this part of the injunction, the Supreme Court recognized that the state court had "few other options to protect access," and the Court gave deference to the state court's familiarity with the facts and the background of the dispute between the parties, even in light of its heightened review. *Id.* at 769, 114 S.Ct. at 2527. The Court considered the fact that an earlier, more narrow injunction failed to accomplish its purpose, but stopped short of setting any requirement for a similar failure of a narrow restriction as a prerequisite for injunctions in future cases. *Id.* The Court concluded that "the 36–foot buffer zone around the clinic

entrances and driveway burdens no more speech than necessary to accomplish the governmental interest at stake." *Id.*

■ The Supreme Court in *Madsen* also identified numerous significant government interests protected by the injunction, including: a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy; ensuring public safety and order; promoting the free flow of traffic on public streets and sidewalks; protecting the property rights of citizens; and protecting residential and medical privacy. *Madsen*, 512 U.S. at 767–68, 114 S.Ct. at 2526. The Court found that these governmental interests were sufficient to justify an appropriately tailored injunction to protect them. *Id.*

Here, the same significant governmental interests exist, and almost identical interests are listed in the trial court's conclusions of law. We hold that the governmental interests in this case are sufficiently significant to justify and demand injunctive relief. We now must evaluate the terms of the injunction to determine if they contain the least restrictive means of protection and are tailored to burden no more speech than necessary.

In *Madsen*, the United States Supreme Court upheld a complete buffer zone to protect access to the abortion clinic at issue. The only provision of the clinic buffer zone that the Court struck down was that portion which extended onto the private property of adjoining landowners at the sides of the clinic.[4] The zones at issue here do not extend onto private property other than the property on which their clinics or homes are situated. Each of the distance restrictions in the buffer zones in this case are narrower than the 36–foot zone upheld in *Madsen*.

The trial court in this case conducted an evidentiary hearing in addition to the jury trial. Appellants agreed to stipulate to maps, photographs and written descriptions of the proposed buffer zones that were introduced in evidence. Photographic evidence demonstrated that appellants could still be seen outside the prohibited zones. Each zone has been specifically tailored to the geography of the particular clinic. The width and breadth of each zone varies widely depending on the physical characteristics and location of each clinic. The zones range from fifteen to thirty-two feet, depending upon the particular requirements for adequate clinic access.

For example, there was testimony that patients were required to cross two streets from the parking lot to the Planned Parenthood entrance. Narrow corridors were provided across these streets to enable patients to cross the streets without fear of unwanted interference. At the A–Z Women's Clinic, which is located in a high-rise office building, the prohibited zone is fifteen feet from the driveways leading to the clinic's private parking lots, leaving one lane of traffic open for cars to enter and exit. Appellants can still be seen and heard at these locations. The West Loop Clinic has one of the largest buffer zones, thirty-one feet. It is justified due to the physical lay-out of the clinic which fails to provide any separation between appellants and arriving patients. In addition, the West Loop Clinic has been the target of repeated and dangerous acts of protest, including butyric acid attacks and fire-bombing.

We believe that the injunction satisfies the Texas Supreme Court's concern that distances not be imposed based solely upon "administrative convenience." *Tucci*, 859 S.W.2d at 6. We find that the evidence established that these zones are the least restrictive means and are "essential to preserve the right of clinic access" as required by *Tucci. See Tucci*, 859 S.W.2d at 7. In addition, we find the injunction satisfies *Madsen*'s requirement for "precision of regulation" to insure that the injunction burdens no more speech than necessary. *Madsen*, 512 U.S. at 767, 114 S.Ct. at 2525–26.

■ Appellants also argue, as part of B/J's points one through three, that the injunction on picketing near the clinics and physicians' residences is overbroad. OR

---

4. The Court also struck down other prohibitions in the injunction, apart from the buffer zone, that are not at issue here.

raise essentially the same argument under their point of error forty-four. They contend that the injunction improperly bans *all* speech included within the term "demonstrating" within the buffer zones. This argument is unpersuasive because the United States Supreme Court upheld a complete ban on "demonstrating" within a 36–foot "speech-free" zone in *Madsen*. *Id.* at 768–69, 114 S.Ct. at 2526–27.

■ Appellants also contend the ban on residential picketing is unconstitutional. The injunction banned all "picketing, patrolling, or demonstrating within ... zone[s] along the entire ... street edge of [each physician's] property extending 13 feet from the property line" into the street where the residence is located.

Appellants maintain that the United States Supreme Court's decision in *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) controls the constitutionality of the ban on protests at the physicians' residences. The Court traditionally subjects restrictions on public issue picketing to careful scrutiny. The restrictions must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication. *Id.* at 482, 108 S.Ct. at 2501. In *Frisby*, the Court upheld an ordinance banning picketing in residential neighborhoods, finding anti-abortion protestors had ample alternative means to proselytize their views. *Id.* at 484, 108 S.Ct. at 2502. The Court construed the ban narrowly as prohibiting focused picketing taking place in front of a particular residence. *Id.* at 483, 108 S.Ct. at 2501–02.

■ The Court also found the restriction served a significant government interest: the protection of residential privacy. *Id.* A restriction is narrowly tailored if it eliminates no more than the exact source of the "evil" it seeks to remedy. *Id.* at 485, 108 S.Ct. at 2502–03. The Court found that focused picketing inherently and offensively intrudes on residential privacy. *Id.* at 486, 108 S.Ct. at 2503. The First Amendment permits the government to prohibit offensive speech as intrusive when the "captive" audience cannot avoid the objectionable speech. *Id.* at 487, 108 S.Ct. at 2503–04. The Court concluded

that a complete ban on targeted picketing is narrowly tailored to eliminate the "evil" of an unwelcome visitor at the home. *Id.*

■ The Supreme Court applies a "somewhat more stringent application of First Amendment principles" when evaluating an injunctive order than it does when a content-neutral, generally applicable statute is reviewed, as was the case in *Frisby*. *Madsen*, 512 U.S. at 765, 114 S.Ct. at 2524. Consequently, the injunction must satisfy the review announced in *Madsen*, that is, it must burden no more speech than necessary to serve a significant government interest. *Id.* at 765, 114 S.Ct. at 2525.

The injunction in *Madsen* prohibited picketing and demonstrating within 300 feet of the residences of clinic staff. *Id.* at 774, 114 S.Ct. at 2529. In striking down this provision, the Court found a 300–foot zone would ban general marching through the neighborhood or even a walking route in front of an entire block of houses, instead of a prohibition on "focused picketing taking place solely in front of a particular residence" that the Court had approved in *Frisby*. *Id.* at 775, 114 S.Ct. at 2530. The court recognized that a "limitation on time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." *Id.*

The more narrow restriction proposed by the U.S. Supreme Court is precisely what the trial court imposed in this case. This injunction prohibits protests in a small zone in front of each doctor's residence. There are time limits within each 24–hour period and limits on sound amplification within 100 feet of the residences. In *Madsen*, the Supreme Court approved even broader limitations on sound amplification near the residences of clinic staff. *Id.* at 774, 114 S.Ct. at 2529. Appellants complain that the buffer zone impermissibly prohibits them from passing through the neighborhood. However, the zone is only thirteen feet deep, and protestors have ample access to picket through the neighborhood, so long as they do not "focus" on the area in front of a particular doctor's residence. The thirteen-foot zone is necessary to permit the doctors' families to have

access to their driveways, and it leaves one lane of traffic open for alternate channels of communication by appellants or others.

We hold the injunction on protests at the doctors' residences satisfies the criteria set forth in *Frisby* as well as *Madsen,* and is therefore constitutional.

■■■ Appellants also contend the trial court made no specific factual findings supporting the injunctive relief. They argue the court instead made mere conclusions that appellants conduct "threatened" the access and use of the clinics. Appellants failed to preserve this complaint for our review. In any cause tried without a jury, any party may request the court to state in writing its findings of fact and conclusions of law. TEX.R. CIV. P. 296. When part of a cause is decided by a jury and part by the court, the party appealing the court-decided issue should request findings of fact and conclusions of law. *Heafner & Assocs. v. Koecher,* 851 S.W.2d 309, 313 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Shenandoah Assocs. v. J & K Properties, Inc.,* 741 S.W.2d 470, 484 (Tex.App.—Dallas 1987, writ denied).

■■■ The findings in this case satisfy the general requirements for injunctions. Rule 683 governs injunctions, and provides in relevant part:

> Every order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

TEX.R. CIV. P. 683. The requirements of Rule 683 are mandatory and must be strictly followed. *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex. 1986). Findings of fact are not required to challenge the validity of an injunctive order

that fails to state a reason for its issuance. *Courtlandt Place Historical Found. v. Doerner,* 768 S.W.2d 924, 926 (Tex.App.—Houston [1st Dist.] 1989, no writ). While every order granting an injunction must set forth the reasons for its issuance in the order itself, if the enjoined party wishes additional, detailed findings, the party may make a request under the rules of procedure governing findings of fact generally. *Transport Co. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 553 (1953). Where a party fails to request additional or amended findings after the court files its original findings, the party waives the right to complain on appeal that the findings were not full and complete or that the court failed to enter additional findings of fact. *McDuffie v. Blassingame,* 883 S.W.2d 329, 337 (Tex.App.—Amarillo 1994, writ denied).

■■■ Here, the trial court's injunctive order adequately stated the specific reasons for its issuance. If additional findings were needed, appellants should have requested them. By failing to request additional findings, appellants have waived any right to complain about omitted or incorrect findings.[5] *See Dallas Morning News Co. v. Board of Trustees Dallas ISD,* 861 S.W.2d 532, 538 (Tex.App.—Dallas 1993, writ denied). Without a request, omitted findings will be presumed in support of the judgment. *James Holmes Enters., Inc. v. John Bankston Constr. & Equip. Rental, Inc.,* 664 S.W.2d 832, 834 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.).

The court recited appellants' specific conduct which justified the injunctive relief. The court found that appellants continued their protest activity despite existing injunctions imposing place and manner restrictions, and concluded that absent injunctive relief, defendants were likely to continue to engage in their tortious conduct. In fact, appellants have brazenly ignored the previous orders of judges in several states. The court determined that narrowly tailored injunctive relief was required to protect several significant governmental interests, which are substan-

5. Appellants objected to the trial court's findings in their motion for new trial. The record does not contain a request for additional findings, however, and the motion for new trial cannot be construed as a timely request. *See* TEX.R. CIV. P. 298.

tially the same as those identified in *Madsen.* The court detailed the specific, narrowly tailored zone around each clinic's entrance. Each zone was a "[m]eans of protecting unfettered ingress and egress from the clinic, ensuring that [appellants] do not block traffic." *Madsen,* 512 U.S. at 769, 114 S.Ct. at 2526. These zones, by their very descriptions, demonstrate that they are designed to limit no more than the very evil of "in-your-face" harassment shown by the evidence at trial and to permit adequate access to the clinics. We hold that the court's findings are adequate and correct.

In conclusion, we find that the permanent injunction violates neither the federal nor state constitution. B/J points one through three, and OR points forty-two through forty-four are overruled.

## Actual Damages

■■■ In points of error thirty-two through thirty-six, OR attack the actual damages. They first argue the evidence is insufficient to support causation and foreseeability. They contend that it is not known who committed the acts of vandalism which necessitated repairs to the clinic. In point of error thirty-six, OR argues the damages are excessive. They contend the other costs on which damages were based are associated with increased security measures, and are not properly recompensable as items of damages.

■■■ In an action for interference with business relations, a plaintiff may recover "[s]uch damages ... as are a natural and proximate consequence of the interference." *Gonzalez v. Gutierrez,* 694 S.W.2d 384, 390 (Tex.App.—San Antonio 1985, no writ). For civil conspiracy, a Texas plaintiff is entitled to recover all damages that "naturally flow from the civil conspiracy." *Fenslage v. Dawkins,* 629 F.2d 1107, 1110 (5th Cir.1980) (citing *Great Nat'l Life Ins. Co. v. Chapa,* 377 S.W.2d 632, 635 (Tex.1964)).

Reiner testified to the following costs of repairs, alterations, and safety measures at Planned Parenthood: (1) construction costs totalling $109,467, which included: $30,812 for a security system; $5,030 for a halon fire suppression system; $42,650 for a more so-

phisticated sprinkler system; $1,149 for extra fencing; $7,658 for guard services during construction; $3,896 for bullet resistant glass windows; $485 for covering the air conditioning lines; $403 for repairs to the vandalized air conditioning lines; $17,384 for upgrade of the fire alarm system; (2) $33,468 for an additional security guard during the Republican Convention; (3) $21,650 in damages caused by a butyric acid attack; and (4) costs for an escort program totalling approximately $40,000. These sums total $204,585, the amount of actual damages awarded by the jury.

In addition to evidence of appellants' conduct already cited, Reiner testified appellants were responsible for the damages at Planned Parenthood, which required repairs and alterations to the building. By way of example, Reiner testified she heard Treshman describe over his hot line how to conduct a butyric acid attack. Her clinic was then the target of just such an acid attack. Roof and floor tiles were "permeated with a horrible stench" and had to be replaced. She testified that "[b]ecause of the fear of fire bombs, we needed some extra protection." She testified these changes to the building were necessitated solely by appellants' conduct, along with that of their co-conspirators and agents. She stated that "these four defendants [against whom damages were awarded] clearly have conspired to initiate additional costs through their very actions and deeds and their own statements." This testimony was uncontradicted.

Planned Parenthood sought reimbursement for out-of-pocket expenses it incurred as a result of appellants' illegal protest activity. The evidence previously recited demonstrates that appellants acted intentionally to shut down the clinics and to keep patients away. It was foreseeable that Planned Parenthood would be forced to respond to the threats and acts of vandalism with appropriate security measures. Appellants cite to no evidence in the record that Planned Parenthood's expenses were excessive or unnecessary. Judy Reiner testified these changes were essential to continued clinic operation. We conclude that the evidence in the record is factually sufficient to support the actual

damages awarded by the jury. We overrule OR's points of error thirty-two through thirty-six.

### Punitive Damages

In points of error thirty-seven and thirty-nine, OR assert the punitive damages awarded are erroneous because the jury did not award specific actual damages caused by appellants' conduct in maliciously engaging in a conspiracy to interfere with Planned Parenthood's business. OR argue that a reasonable proportionality between actual and punitive damages cannot be shown as required by the Texas Supreme Court.

Actual damages were based on affirmative answers to either Question No. 6, in which the jury found appellants wrongfully interfered with the ability of the clinics to provide medical services, or Question No. 3 on proximate cause of damages from the conspiracy. In answer to Question No. 1, on which Question No. 3 was predicated, the jury found appellants engaged in a conspiracy to interfere with the clinics' business. Question No. 4, which asked whether OR acted with malice, was limited to malice as to the conspiracy.

Appellants correctly cite the general rule there must be a finding of actual damages in tort to uphold an award of punitive damages. *See Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986). Here, the jury awarded actual damages in tort, but awarded punitive damages based only on conspiracy.

OR did not object to the charge on the basis that the damages could result from the conspiracy or wrongful interference with the clinics. It raised no objection to Questions Nos. 7–10, the damages questions, which were predicated on an affirmative answer to **either** a conspiracy finding or a finding of wrongful interference. Therefore, OR has waived any error in this regard. *Cosgrove v. Grimes,* 774 S.W.2d 662, 665–66 (Tex.1989) (holding the defendant waived error by failing to object to defective damages submission); Tex.R. Civ. P. 274. We overrule points of error thirty-seven and thirty-nine.

In point thirty-eight OR contest the factual sufficiency of the evidence supporting punitive damages. In considering the propriety of an award of punitive damages, we must apply the review enunciated in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994). The Texas Supreme Court requires that when we conduct a factual sufficiency review of a punitive damages award, we must detail the relevant evidence in our opinion as to why the evidence supports or does not support the punitive damages in light of the factors in *Alamo Nat. Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). *Id.* at 31. These factors are: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Kraus,* 616 S.W.2d at 910. Exemplary damages must be reasonably proportioned to actual damages. *Id.* The Supreme Court acknowledged in *Kraus,* however, that there is no set ratio between actual and punitive damages. *Id.*

The amount of actual damages awarded was $204,585 and the total amount of punitive damages were $1,010,000. Similar ratios are routinely approved by courts of this state. It is significant that the amounts found against the individual defendants were substantially less than those against the organizations. It is also significant that the jury awarded $5,000 additional punitive damages, over and above the amount originally requested, against Rescue America, and its leader Don Treshman, for whom there was abundant evidence of involvement in organizing the protests and encouraging acts of vandalism. The evidence already discussed shows that the organizers acted intentionally and with malice. They were unconcerned about the consequences so long as their goal of stopping abortion was achieved. The evidence of appellants' conduct in this case, such as firebombing, acid attacks, and death threats, is so egregious as to be highly offensive and repugnant to law abiding citizens.

We conclude that the evidence supporting the jury's award of punitive damages is fac-

tually sufficient. OR's point of error thirty-eight is overruled.

■ In point of error forty, OR challenge the award of punitive damages because two of the jurors voting for punitive damages did not join in the verdict on actual damages. Only ten of the twelve jurors voted to award actual damages.

Rule 292 provides that the same ten members of an original jury of twelve may render a verdict. TEX.R. CIV. P. 292; *Palmer Well Servs., Inc. v. Mack Trucks, Inc.,* 776 S.W.2d 575, 576 (Tex.1989). There is a split of authority as to whether the same ten jurors who found liability in the first phase of the trial must agree upon the amount of punitive damages in the second phase of a bifurcated trial. The Corpus Christi Court of Appeals determined that they did not, finding Rule 292 does not apply. *Greater Houston Transportation Co. v. Zrubeck,* 850 S.W.2d 579, 588 (Tex.App.—Corpus Christi 1993, writ denied). Recently, the Amarillo Court of Appeals reached the opposite conclusion. *See Hyman Farm Serv., Inc. v. Earth Oil & Gas, Inc.,* 920 S.W.2d 452 (Tex.App.—Amarillo 1996, no writ). In *Hyman,* the court rejected what it called "dicta" in *Zrubeck,* and held that Rule 292 requires the same ten or more jurors to concur in all answers necessary to a judgment, including the answer to the amount of punitive damages awarded, if any, in a bifurcated trial. *Id.* at 457–58.

■ We need not decide whether Rule 292 applies because appellants made no objection before the verdict to the two dissenting jurors' participation in the punitive damages deliberations. In fact, appellants demanded the two jurors' participation. Thus, they have waived any complaint. TEX.R.APP. P. 52(a). Moreover, the punitive damages verdict was unanimous. Therefore, the same ten jurors that voted to award actual damages found punitives. In the event it was error for the other two jurors to join in the verdict, it is clearly harmless. We overrule point of error forty.

■ In point of error forty-one, OR challenge Planned Parenthood's amendment of its damages request after the jury verdict but before rendition of judgment. The jury awarded $5,000 additional punitive damages, above the amount requested, against Treshman and Rescue America. Planned Parenthood requested a pre-judgment trial amendment, which the court granted. The trial court then incorporated the amended amounts in its judgment. OR contend the amendment operated to their surprise and prejudice, and that it was violative of Rule 47.

■ Rule 47 requires a pleading setting forth a claim for relief to give fair notice of the claim involved and to state that the damages sought are within the jurisdictional limits of the court. TEX.R. CIV. P. 47. A pleading is sufficient when it gives fair and adequate notice of the facts upon which the pleader basis its claim. *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). The purpose of Rule 47 is to give the opposing party information sufficient to enable him to prepare a defense. *Id.*

■ The trial court has no discretion to deny a trial amendment unless appellants *demonstrate* surprise. *Chapin & Chapin, Inc. v. Texas Sand & Gravel Co.,* 844 S.W.2d 664, 665 (Tex.1992); *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex. 1990); TEX.R. CIV. P. 63 (requiring leave to amend to be granted absent a showing of surprise); TEX.R. CIV. P. 66 (requiring the court to freely allow amendment in absence of showing of prejudice). Appellants failed to show they were surprised by the amendment. We hold the trial court did not abuse its discretion in permitting the pre-judgment amendment to appellees' pleadings. OR point of error forty-one is overruled.

### Errors in the Judgment

■ OR complain in point of error forty-eight, and B/J complain in point thirty-one, that the trial court erred in failing to include "take-nothing" provisions in favor of appellants against some of the plaintiffs. The jury did not find that appellants violated the rights of Dr. Richard Cunningham, Dr. Howard Novick, or two businesses adjoining Planned Parenthood, Brian G. Martinez, D.D.S., and O'Connor & Co., d/b/a Adkins Architectural Antiques. The court recited in

the judgment, however, the jury's answers to each question as to each plaintiff and intervenor. Appellants cite no authority that the trial court's failure to include "take-nothing" provisions is reversible error. Unsupported points of error are waived. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex.1983). We overrule OR point of error forty-eight and B/J point of error thirty-one.

In OR's points forty-nine and fifty and B/J's points thirty-two and thirty-three, appellants argue that the trial court erroneously amended its judgment. Appellees requested the court to correct two matters they deemed "clerical errors." The two changes were: (1) to correct the parenthetical numerical in the award of punitive damages to $355,000 to coincide with the wording; and (2) to change the enforcement paragraph in the injunction by adding "any officer, agent, servant, employee, attorney, or person acting in active concert with defendant, who has actual notice of the order." OR assert that this second change is not a clerical error. OR concede that the transferee court had plenary jurisdiction over the judgment by virtue of appellants' timely filed motion for new trial, but argue the court could not correct a "judicial error" in the enforcement paragraph of the judgment.

"Clerical errors" are mistakes or omissions that prevent the judgment as entered from reflecting the judgment as rendered. The trial court may correct clerical mistakes even if it has lost plenary jurisdiction. *Andrews v. Koch*, 702 S.W.2d 584, 585 (Tex.1986); TEX.R. CIV. P. 316, 329b(h).

First, we note that the injunctive order section of the judgment provides that: "defendants, their officers, directors, agents, representatives, employees, attorneys, and all persons acting in concert with or participating with, by or through them are enjoined and restrained from the following:...." Thus, we find that addition of the same language to the enforcement paragraph was necessary and proper to correct a clerical error. In addition, we note that Rule 683 contemplates the injunctive order being binding upon "parties, their officers, agents, servants, employes, and attorneys, and upon those persons in active concert or partic-

ipation with them who receive actual notice of the order." *See* TEX.R. CIV. P. 683. Therefore, the correction to comply with the terms of the rule was properly made. We find no error in the correction in the amended judgment of this clerical error and overrule OR's points forty-nine and fifty and B/J's points thirty-two and thirty-three.

In OR point of error fifty-one and B/J point thirty-four, they argue the trial court had no authority to enter the judgment nunc pro tunc to correct the amended judgment. Appellants' motion for new trial was overruled on February 10, 1995. The trial court entered a judgment nunc pro tunc on June 15, 1995 to include attachment of exhibits describing the buffer zones. These exhibits were referred to in the original judgment, and were attached to that judgment. When the judgment was first amended, the exhibits were inadvertently omitted. Failure to attach the exhibits to the judgment is a clerical error, not a judicial error. Therefore, the trial court could properly enter a judgment nunc pro tunc after expiration of it plenary power. TEX.R. CIV. P. 316, 329b(h). We overrule OR point of error fifty-one and B/J point of error thirty-four.

### Costs

Appellants complain about the trial court's allocation of costs in OR's points of error fifty-two through fifty-four and B/J points thirty-five through thirty-seven. On May 23, 1995, the court ordered the district clerk to issue a new cost bill reflecting "previously taxed costs" of $15,057.75 and adding "retaxed additional costs" of $15,087.82.

The successful party shall recover costs from its adversary. TEX.R. CIV. P. 131. A "successful party" is one who obtains a judgment of a competent court vindicating a civil claim of right. *Perez v. Baker Packers*, 694 S.W.2d 138, 143 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Allocation of costs is a matter for the trial court's discretion and cannot be overturned absent a showing of abuse. *Hill v. Robinson*, 592 S.W.2d 376, 378 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.); *Coleman v. Donaho*, 559

S.W.2d 860, 864 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ dism'd).

A court may not adjudge costs other than as provided by Rule 131 unless good cause is shown. *Dover Elevator Co. v. Servellon,* 876 S.W.2d 166, 169 (Tex.App.—Dallas 1993, no writ); *Contemporary Health Management, Inc. v. Palacios,* 832 S.W.2d 743, 745 (Tex.App.—Houston [14th Dist.] 1992, no writ); TEX.R. CIV. P. 141. In the absence of an explanation for assessing costs contrary to the rule, the trial court abuses its discretion. *See Guerra v. Perez & Assoc.,* 885 S.W.2d 531, 533–34 (Tex.App.—El Paso 1994, no writ); *Dover Elevator Co. v. Servellon,* 812 S.W.2d 366, 367 (Tex.App.—Dallas 1991, no writ).

A motion to adjudge costs involves an assessment by the court as to who shall pay the costs, while a motion to retax costs involves the question of the amount of costs assessed. *Reaugh v. McCollum Exploration Co.,* 140 Tex. 322, 167 S.W.2d 727, 728 (1943); *City of Ingleside v. Stewart,* 554 S.W.2d 939, 948 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). A motion to retax costs is one to correct the ministerial act of the clerk of the court in tabulating costs. *Wood v. Wood,* 159 Tex. 350, 320 S.W.2d 807, 813 (1959).

In OR point fifty-two and B/J point thirty-five, appellants complain that the court failed to reduce the costs awarded against them by a proportionate amount for the two plaintiffs against whom all defendants were successful and the eight plaintiffs against whom one of the defendants was successful. We are cited to no authority requiring the trial court to make this proportionate reduction in costs. Moreover, rather than retaxing of costs, this proportionate reduction is an allocation or adjudication of costs, which was required to be made within the trial court's plenary power. Where the complaint is made of the ruling of a court in adjudging costs against the wrong party, the error is inherent in the judgment and must be properly assigned, just as any other alleged error. *Reaugh,* 167 S.W.2d at 728.

In OR point fifty-three and B/J point thirty-six, appellants argue the court was without jurisdiction to retax costs because more that thirty days had elapsed since appellants' motion for new trial was overruled. Because taxing of costs, as distinguished from the adjudication of costs, is merely a ministerial duty of the clerk, an error may be corrected upon the injured party's motion, even after the case has been disposed of on appeal, as long as the request is made before the mandate issues and the costs are paid. *Hartzell Propeller, Inc. v. Alexander,* 517 S.W.2d 455, 456 (Tex.Civ.App.—Texarkana 1974, no writ). We find the trial court had authority to retax costs.

In OR point fifty-four and B/J point thirty-seven, appellants contend the retaxed costs are in error.

The Civil Practice and Remedies Code Provides in relevant part:

A judge of any court may include in any order or judgment all costs, including the following:

(1) fees of the clerk and service fees due the county;

(2) fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit;

(3) masters, interpreters, and guardians ad litem appointed pursuant to these rules and state statutes; and

(4) such other costs and fees as may be permitted by these rules and state statutes.

TEX. CIV. PRAC. & REM.CODE ANN. § 31.007(b) (Vernon Supp.1996).

Appellants complain about being assessed the costs for the following: (1) $6,030.53 for citing by publication 10,000 John and Jane Doe defendants who were later nonsuited; (2) $5,308.80 and $1,245 for the transcript of the hearing on the temporary injunction; (3) $859.40 for transcripts of four depositions taken by defendants; (4) $2,355 for rental of a television and video recorder; (5) $120 for copies of videotapes (6) $416 and $118.77 for photos of the clinics and residences; (7) $3,627.50 for service of citation on eight defendants by private process servers; and (8) $382.35 for service of subpoenas.

All of these costs were necessary to the conduct of the trial. Most of these expenditures, such as rental of the television and video recorder, were specifically ordered by the trial court. The trial court also ordered appellees to provide appellants with copies of the videotapes they intended to show at trial. It was also the trial court who ordered the unknown Doe defendants to be served because they would be bound by the injunction as appellants' agents. The affidavit from Neal Manne, appellees' counsel, substantiates that the trial court ordered these expenses and that they were reasonably and necessarily incurred in the prosecution of the suit. In addition, the affidavit from Judy Reiner states that the fees were reasonable and necessary to prosecute the suit. Deposition expenses are properly chargeable as court costs. *Wallace v. Briggs*, 162 Tex. 485, 348 S.W.2d 523, 527 (1961); *Shenandoah Assocs. v. J & K Properties, Inc.*, 741 S.W.2d 470, 487 (Tex.App.—Dallas 1987, writ denied). Subpoena and citation fees are recoverable as court costs. *Shenandoah*, 741 S.W.2d at 487. The affidavits attached to appellees' motion support a determination by the trial court that the transcript from the temporary injunction hearing was "necessarily obtained for use at trial," in accordance with TEX. CIV. PRAC. & REM.CODE ANN. § 31.007(b)(2).

Attached to the trial court's order retaxing costs are the original itemization from the district clerk and an amended itemization with numerous items deleted from the original list. According to appellees' motion, the redacted items were for costs incurred by plaintiffs other than appellees. From this itemization, it appears that appellees have not been awarded costs for plaintiffs that did not recover. The court's order also reflects that a hearing was conducted on appellees' motion to retax costs. We have no record of the hearing, and in the absence of a record, we cannot determine the basis for the court's order. It is appellants' burden to furnish a sufficient record to demonstrate error. TEX. R.APP. P. 50(d).

We find no abuse of discretion in permitting appellees, the prevailing parties, to recover their costs. We overrule OR's points of error fifty-two through fifty-four and B/J's points of error thirty-five through thirty-seven.

We affirm the judgment of the trial court.

AMIDEI, Justice, dissenting.

I respectfully dissent from the court's majority opinion.

The portion of the judgment awarding a permanent injunction is void and should be reversed and rendered for one or more of the reasons as follows:

1. The trial court did not make a finding there was a threat of imminent harm. The trial court must make such finding to support a permanent injunction. *Frey v. DeCordova Bend Estates*, 632 S.W.2d 877, 881 (Tex. App.—Fort Worth 1982), *affirmed*, 647 S.W.2d 246 (Tex.1983); *Isuani v. Manske–Sheffield*, 805 S.W.2d 602, 605 (Tex.App.—Beaumont 1991, writ denied); *Green v. Unauthorized Practice of Law Committee*, 883 S.W.2d 293 (Tex.App.—Dallas 1994, no writ) (a prevailing, successful petitioner for injunctive relief must demonstrate the following grounds: (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate and realistically complete remedy.); *Univ. Interscholastic League v. Buchanan*, 848 S.W.2d 298, 301 (Tex. App.—Austin 1993, no writ); *Hues v. Warren Petroleum Co.*, 814 S.W.2d 526, 529 (Tex. App.—Houston [14th Dist] 1991, writ denied).

The trial court merely made the following conclusion of law:

"1. Absent injunctive relief, defendants are *likely* to continue to engage in the tortious conduct found by the jury to be in violation of Plaintiff clinics and physicians' common law and constitutional rights, and such conduct is *likely* to cause plaintiff clinics and physician *irreparable* harm." (Emphasis added)

There is no language in such conclusion which directly stated or implied there was at the time of trial a threat of imminent harm. The Republican National Convention had long since been over as well as the picketing activities the subject of this action. There

was no threat of imminent harm, and the trial court found none. For this reason alone the injunctive portion of the judgment should be held void and reversed and rendered in favor of the appellants.

The question regarding "imminent harm" cannot be deemed because the appellants submitted jury question and instruction no. 4 to the court asking whether the appellees were subject to imminent harm. The court refused such question and instruction.

2. There was no irreparable harm notwithstanding the finding in the above stated conclusion no. 1. Injunctive relief is not proper when an adequate remedy at law, i.e. a claim for damages, was available. *Id.* at 530; *Mitchison v. Houston I.S.D.*, 803 S.W.2d 769 (Tex.App.—Houston [14th Dist] 1991, writ denied) (a party demonstrates irreparable harm when he shows that an award of damages a month later will not provide adequate compensation). To state it is likely there will be harm in the future is not to say it is an imminent threat. Further, the appellees recovered a jury verdict in the amount of $1,214,585 not including personal injuries against the appellants. If this type award is not adequate, then it was the will of the jury, which could have made it more. I believe the award is more than adequate under the circumstances. If there are any damages in the future, which is unlikely, another jury will be available to make the appellees whole. Damages awarded by the jury far exceeded any out of pocket expenses of the appellees.

3. The trial court failed to state reasons for its issuance pursuant to Rule 683 Texas Rules of Civil Procedure. Rule 683 requires the court in *every* order granting an injunction to set forth the reason for its issuance. Further, the reasons shall be specific in terms and shall describe in reasonable detail and not by reference to the complaint or document, the act or acts sought to be restrained. Rule 683 Texas Rules of Civil Procedure.

The trial court made the following findings:

1. Defendants' conduct threatens access to plaintiff clinics by women seeking abortion and other medical services; [in Point of Error 25]

2. Defendants' conduct threatens the use and enjoyment of plaintiff clinics' and physicians' property rights; [in Point of Error 26]

3. Defendants' aggressive and harassing manner of protesting and sidewalk counseling of clinic patients increases the risk attendant to the abortion procedure; [in Point of Error 27]

4. Defendants' targeted picketing of plaintiff physicians' homes threatens and interferes with plaintiff physicians' right of privacy [;] [in Point of Error 28]

5. Defendants have not abandoned their activities toward plaintiffs, but (1) remain committed to their particular protest tactics and would use them again toward plaintiffs if the circumstances (such as a national media event in Houston) presented itself; (2) have aided and abetted others in continuing to engage in conduct that is either tortious or in violation of plaintiffs' constitutional rights; and (3) principle (sic) defendants, and those found by the jury to have acted with malice, are either locally based (such as Rescue America and Don Treshman) or have recently increased their organizational presence in Texas (Operation Rescue—National[;] [in Point of Error 29])

6. Despite existing injunctions imposing place and manner restrictions on defendants' protect activities targeting plaintiff clinics, defendants (or those found by the jury to be acting in concert with them) have continued to engage in protest activity toward some of the clinics using tactics that are harassing to patients and clinic staffs, that is violative of clinics' common law and constitutional rights, and that threatens safe, accessible abortions for women seeking medical services at plaintiff clinics. [in Point of Error 30]

These findings are conclusions and do not state the act or acts sought to be restrained. They do not state facts which they could even be tested. This is important because the court was stating reasons to enjoin twenty-

eight different parties. The differing operative facts as to all such parties, including where located, militate against the sweep treatment the court displayed for permanent injunction purposes. The Court failed to state what conduct the appellants were protesting or what they did.

The trial court must state these reasons without any request of the parties. The Court was not required to make findings of fact and conclusions of law as this was a jury case. Rule 296 Texas Rules Civil Procedure specifically provides that findings may be requested in any case tried "without an jury." Therefore, the reasons for injunction could not be waived for not asking for findings of fact and conclusions of law as suggested by the majority.

4. The Permanent Injunction is unconstitutionally overbroad. The Permanent Injunction portion of the judgment provides in Section E that appellants are prohibited from "demonstrating" within described zones that circumvent nine facilities belonging to appellees. "Demonstrating" was defined as "oral or other expression that publicly displays, manifests, or expresses one's feelings or opinions . . . and expressly includes 'sidewalk counseling.' " These zones also extend from the edges of the properties into any adjoining public streets, approximately to the center line of the respective streets adjoining each of the facilities. The zones are shown on plats of each facility attached as exhibits to the judgment. The Planned Parenthood facility also has two protected corridors, fifteen feet wide, extending from two parking lots across the public streets to the facility. The widest zone is thirty-two feet (Women's Medical Center of N.W. Houston) and the narrowest zone is fifteen feet (AAA Concerned Women's Center). Similarly, Section I of the judgment provides restrictions pertaining to the five physician appellees prohibiting "congregating, picketing, patrolling, or demonstrating" within thirteen foot zones extending from their respective property lines into the adjoining streets.

The record does not show any evidence that "such measures are essential to preserve the right of clinic access, and that each satisfies fully the standard we have required under the Texas Constitution" as required by *Ex Parte Tucci*, 859 S.W.2d 1, 7 (Tex.1993). *Tucci* held: "Unless such a restriction is proved to be the least restrictive means of guarding against an irreparable and imminent injury, it is an impermissible infringement on our state constitutional right of free expression." *Id.*

In *Tucci*, Rev. Keith Tucci, and six other abortion protestors, had been held in contempt for violating a temporary restraining order previously entered in these proceedings. The parties, four of whom are appellants in this appeal, brought original habeas corpus proceeding in the Texas Supreme Court asserting they had been confined for expression which is protected under article I, section 8 of the Texas Constitution (freedom of expression). The temporary restraining order, in part, barred demonstrating within one hundred (100) feet of any of the nine clinics, appellees in this appeal. The relators in *Tucci* did not attack any of the other provisions of the restraining orders but challenged only the one-hundred foot limitation as unconstitutional. The confinement of relators was premised solely on their having disregarded portions of the one-hundred foot limitation. The other provisions of the restraining orders were clearly directed to protecting against the specific injuries alleged by the women, clinics and businesses and access by injunctive relief that barred:

> [t]respassing on, physically invading, entering without consent, damaging, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any part of the Planned Parenthood[1] facility . . ., including the entrances and exits, the parking lots . . ., and any of the clinic's or parking lots' entrances and driveways.

Additionally, the temporary restraining orders contained four independent provisions to guard against intimidation and harassment that prohibited:

> Demonstrating within twenty-five (25) feet of any person seeking access to or leaving the clinic, its parking lots, or intervenors' businesses or parking lots, or in any way

---

1. Near identical provisions were included in the order applicable to the other clinics.

impeding such person's entrance to or exit from the clinic, parking lots or businesses;

Physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, or crowding persons entering or leaving, working at, or using any services at Planned Parenthood's above-referenced facility or at the intervenors' businesses;

Harassing, intimidating or physically abusing any doctor, health care professional, or other staff member, employee or volunteer who assists in the provision of services at the ... facility; and

Making any sound or noise (whether by mechanical loudspeaker, sound amplification device or otherwise) that is so loud that it disturbs, injures, or endangers the health or safety of any patient or staff person of the ... facility.

In this case, in an effort to comply with *Tucci*, the trial court conducted an evidentiary hearing on the issues of injunctive relief. The plats of the proposed limited geographical ban were introduced into evidence and attached as exhibits to the judgment. However, there was no evidence introduced at this hearing or during the jury trial that these geographical bans were the least restrictive means available to ensure unimpeded access to clinics and guard against intimidation and harassment. *Tucci* mandates that such restrictions *must* be justified by a proper evidentiary showing that such measures are *essential* to preserve the rights of clinic access and that such restrictions are the least intrusive as to individual liberties. *Tucci*, 859 S.W.2d at 7.

The judgment contains provisions clearly directed to protecting against the specific injuries alleged by the women and clinics. Injunctive relief bars:

A.  Entering without consent upon or damaging any part of the premises, facilities and parking lots of [the nine clinics].

B.  Blocking or attempting to block, barricade, or in any other manner obstruct the entrances to, or the premises of [the nine clinics].

C.  Inhibiting, impeding, obstructing or interfering with, or attempting to inhibit, impede, or obstruct or interfere with the free and unmolested ingress and egress of persons (either pedestrian or vehicular) to and from the facilities and parking lots and the streets and sidewalks adjacent to the facilities and parking lots of [the nine clinics].

D.  Touching, physically abusing, intimidating, or harassing any individual attempting to enter or exit the facilities or parking lots of [the nine clinics].

Section E, as written in the judgment, concerning "demonstrating" violates Article I, Section 8 of the Texas Constitution, as set out in this opinion. However, the above restrictions A through D would be the least restrictive means to protect against the intimidation and harassment complained of. Sections A through D are the least restrictive means that are essential to preserve the right of clinic access or if there is evidence to prove that demonstration-free zones would be the least restrictive means to protect a woman's right to have an abortion as set out in *Tucci* at 7.

For the same reasons, the restrictions in Sections F through H, that pertain to the residences of the physicians specifically provide for injunctive relief that would protect the physicians against the conduct complained of. These restrictions are:

F.  Trespassing on, sitting in, blocking or impeding plaintiff physicians, their family members and their guests or invitees from access to, ingress into or egress from any part of plaintiff physicians' residences.

G.  Inhibiting, impeding or attempting to impede or inhibit the free ingress or egress of any person to the streets that provide access to the streets on which the plaintiff physicians' residences are located;

H.  Harassing, threatening, assaulting, or physically abusing plaintiff physicians, their family members, guests or invitees.

However, Section I of the judgment providing for the 13 foot zone is likewise void under *Tucci* as there was no evidence introduced at the trial or at the hearing on the

injunction that would prove that such a zone would be the least restrictive means to prevent the harm complained of. The United States Supreme Court has approved prior restraints against free speech. *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *Frisby,* abortion protestors brought suit seeking to enjoin the enforcement of a municipal ordinance prohibiting picketing before or about the residence or dwelling of any individual. The Court found that the ordinance did not ban all picketing in residential areas, but only prohibited focused picketing taking place solely in front of particular residences. The ordinance served a significant government interest of protecting residential privacy. An important aspect of such privacy is the protection of unwilling listeners within their homes from the intrusion of objectionable or unwanted speech. The ordinance is "narrowly tailored" to serve that governmental interest, since it targets and eliminates no more than the exact source of "evil" it seeks to remedy: offensive and disturbing picketing focused on a "captive" home audience. It does not prohibit more generally directed means of public communication that may not be completely banned. *Id.* 487 U.S. at 487–89, 108 S.Ct. at 2504. Although injunctive relief is available to prevent picketing, similar to the picketing in *Frisby, Tucci* mandates an evidentiary hearing to prove that a buffer zone, such as is the case here, is the least restrictive means of preventing this harm. Section I could read: "Congregating, picketing, patrolling, or demonstrating in front of the [physician's] residence" if the court finds this is the least restrictive means of preventing the harm. *Id; see also Ex Parte Pierce,* 161 Tex. 524, 342 S.W.2d 424, 427 (1961) (Constitutional protection of the right to free speech and free assembly does not license interference with and obstruction of public ways or entrances to and exists from places of business by picketing).

Further, I would reverse and remand the damages portion (including punitive) of the judgment for the following reasons:

The appellants' complaint that the trial court refused to include in the charge a complete definition of the essential elements of an actionable civil conspiracy as requested has merit. Omitted over objection were the essential elements: (1) one or more overt acts, and (2) damages resulting from the conspiracy. *Massey v. Armco Steel Company,* 652 S.W.2d 932, 934 (Tex.1983); *Metzger v. Sebek,* 892 S.W.2d 20 (Tex.App.—Houston [1st Dist] 1994, writ denied). The essential elements are:

> The plaintiff in a civil conspiracy action must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey,* 652 S.W.2d at 934; *Bernstein v. Portland Sav. and Loan Ass'n,* 850 S.W.2d 694, 705 (Tex. App.—Corpus Christi 1993, writ denied) The "unlawful, overt acts" must be acts in furtherance of the conspiracy. *Massey,* 652 S.W.2d at 934.

In *Massey* the court held plaintiffs had not alleged a cause of action for conspiracy because of failure to allege an unlawful overt act. Harmful error resulted from such omission because the definition of conspiracy was the basis of appellees' causes of action. The first two questions to establish liability on the appellants and questions 3 through 9 establishing damages use the term "conspiracy." It is obvious it was harmful to appellants because a $1,214,585 judgment was rendered against them. This judgment does not include damages for personal injuries, and seems excessive for what was involved. The jury could very well have decided the case differently had the omitted elements been included by the trial judge. The error, in light of the entire record, was reasonably calculated to and probably did cause the rendition of an improper judgment. *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex. 1995).