IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-06-00092-CV

 

Hot Rod Hill Motor Park and 

Roger DEEwayne
Brown,

                                                                                    Appellants

 v.

 

Donmichael Lucas Triolo,

                                                                                    Appellee

 

 

 



From the 361st District
Court

Brazos County, Texas

Trial Court No. 04-001812-CV-361

 



Opinion



 








            Hot Rod Hill Motor Park is a
race track located on Roger Deewayne Brown’s property.  Donmichael Lucas Triolo
sued Brown and Hot Rod Hill, alleging that the track constitutes a nuisance.  The
trial court granted a temporary restraining order prohibiting races and subsequently
issued a temporary injunction that allowed Brown to conduct races, but ordered
that races end by 11:00 p.m. and imposed noise level restrictions.  

            A jury later determined that
the track constitutes a nuisance and awarded Triolo $3,000 in damages for loss
and enjoyment of his property, but no damages for loss of market value.  The
trial court entered a final judgment permanently enjoining Brown from
conducting any races of motorized vehicles for either competition or practice. 
Brown and Hot Rod Hill challenge the permanent injunction on grounds that (1)
the trial court failed to properly balance the equities before issuing the
injunction; and (2) the injunction is more restrictive than justified by the
evidence.  We affirm.

BALANCING THE
EQUITIES

In his first issue, Brown contends that
the trial abused it discretion by imposing a permanent injunction because: (1)
the trial court failed to balance the equities; and (2) the equities do not
support a permanent injunction.

Whether the Trial Court Failed to
Balance the Equities

Question two of the jury charge asked
whether Brown and Hot Rod Hill should be permanently enjoined from “directly or
indirectly conducting or allowing any races of motorized vehicles, both
practice and competitive,” to which the jury answered, “Yes.”  According to
Brown, this was an issue for the trial court, not the jury, but the trial court
merely adopted the jury’s finding without balancing the equities.  Triolo
concedes that the question was improper, but argues that (1) Brown failed to preserve
the issue for appeal, having failed to object to the question at trial; and (2)
the record does not support a finding that the trial court failed to balance
the equities.

Regardless of whether the question was
proper or the issue was preserved, the record is devoid of evidence indicating that
the trial court issued an injunction without balancing the equities.  See Winfield v. Lamoyne, No.
05-94-01851-CV, 1995 Tex.
App. LEXIS 2553, at *15 (Tex. App.—Dallas Oct. 16, 1995, writ dism’d)
(not designated for publication) (Winfield alleged that the trial court failed to balance the equities, but
provided no evidence of such a failure, arguing instead that he “suffers more
harm from the injunction
than LaMoyne suffers from the violations”); see also Estancias Dallas Corp. v. Schultz, 500 S.W.2d 217, 221 (Tex.
Civ. App.—Beaumont 1973, writ ref’d n.r.e.) (“[T]here is an implied finding that the trial court balanced the equities in favor of
plaintiffs by entering the judgment
granting the injunction.”). 
Neither did Brown seek a hearing or request findings of fact.  See Lee v. Bowles, 397 S.W.2d 923, 924 (Tex.
Civ. App.—San Antonio 1965,
no writ) (trial court held a separate hearing on the issue of balancing the
equities); see also Sixth
RMA Partners, L.P. v. Sibley,
111 S.W.3d 46, 52 (Tex. 2003)
(“When neither party requests findings
of fact and conclusions of law, it is implied that the trial court made all
fact findings necessary to support its judgment”); Operation Rescue-Nat’l v. Planned
Parenthood, 937 S.W.2d
60, 82 (Tex. App.—Houston [14th Dist.] 1996), aff’d as modified by 975
S.W.2d 546 (Tex. 1998) (“When
part of
a cause is decided by a jury and part by the court, the party appealing the court-decided
issue should request findings of fact and conclusions of law.”).  The record before us does not establish
that the trial court failed to balance the equities.        

Whether the Equities were Properly
Balanced 

Abatement of a nuisance is a “discretionary
decision for the judge after the case has been tried and the jury discharged.”  Schneider Nat'l Carriers, Inc. v. Bates, 147 S.W.3d 264, 286 (Tex. 2004).  The
trial court must balance
the equities
before issuing an injunction, considering injury to (1) the defendant and the
public were the injunction granted and (2) the complainant were the injunction
denied.  See Storey
v. Cent. Hide & Rendering Co.,
226 S.W.2d 615, 618-19 (Tex. 1950).  An injunction will ordinarily be denied if the “injury to the complainant is
slight in comparison to the injury caused the defendant and the public.”  Id. at 619.  Conversely, an injunction may issue if the injury
to the defendant and the public is slight when compared to injury suffered by
the complainant.  See id.  “Public convenience or necessity, economic
burden to the defendant, and the adequacy of a legal remedy may affect this
balance.”  McAfee MX v.
Foster, No. 02-07-00080-CV, 2008 Tex. App. LEXIS 968, at *8 (Tex.
App.—Fort Worth Feb. 7, 2008, pet. denied), petition for cert. filed, No. 08-639 (U.S.
Nov. 12, 2008).  We
review a trial court’s decision to grant a permanent injunction for abuse of discretion.
 See Operation Rescue-Nat'l v. Planned
Parenthood of Houston & Se. Tex., Inc., 975 S.W.2d 546, 560 (Tex. 1998).

Factual Background

In 1999, Brown began building Hot Rod
Hill, a sole proprietorship, working twelve to sixteen hours a day for three
years to complete it.  He sold rental properties and racing equipment to fund
construction.  He purchased other equipment that he had to repair to build the
track.  

The track is affiliated with the
International Motor Contest Association.  The racing season begins in March and
ends in October.  Races are held on nineteen or twenty dates out of thirty-two
potential dates, approximately 160 hours of racing per year.  Sixty to eighty
cars usually participate, but there can be up to one hundred.

Triolo’s current home is about one-half
to three-quarters of a mile from the track.  When suit was filed, he resided in
a home located half a mile from the track.  He testified that races run as late
as 1:30 a.m. and resume around 7:30 a.m. on Sunday.  Triolo complained that the
noise is loud, excessive, irritating, annoying, constant, sounds like it is in
his backyard, prevents him from sleeping or enjoying dinner with his family,
and requires him to increase the volume of the television.  He hears motors
revving and cars backfiring.  He cannot escape the noise and can hear it any
day of the week.  On weekends, he and his family leave home to avoid the
noise.  He has measured the noise with a decibel meter and took readings in
excess of eighty decibels.  

Triolo purchased nine lots in the area
for $69,000.  He sold eight lots at $20,000 each and built his new home on lot
nine.  He said that he could have made more money if not for the track, losing
approximately $3,000 to $5,000 per lot.  He cannot remain in his home if the
track remains open.  If forced to sell, the track will limit the potential market. 
He would have no reason to sell if the track is closed.

Several homeowners in the area testified
that the noise from the track is excessive.[1]
 They described the noise as constant, nerve-racking, unbelievable, intolerable,
and inconvenient.  It echoes, sounds like a “locomotive coming through the
house,” and causes windows and light fixtures to shake.  Residents have
difficulty sleeping, having a conversation at home or over the telephone,
watching television, and spending time outdoors.  The noise has even driven
some residents from their homes on Saturday nights.  Joyce Watkins testified
that her family no longer visits because her grandchildren cannot sleep at
night.  Felicia Boegner built a privacy fence to block out the noise and
lights, but can still hear the noise.  Darrell Luedke can hear the noise even
though his home consists of walls with twelve inches of insulation and is
separated from the track by a forest of trees.       

The Sheriff’s Department has received
numerous complaints and issued several warnings or citations regarding the noise
and lateness of the races.  Deputies described the noise as “somewhat deafening,”
loud, excessive, disturbing, and irritating.  It made conversing with
complainants difficult.  On one occasion, Brown was issued a citation after
receiving a warning approximately one hour earlier.  On another occasion, he
received a citation approximately one hour before races ended around 12:30
a.m.  The deputies’ noise measurements often revealed levels exceeding eighty
or ninety decibels.  The Department has received numerous complaints in a
single night.

Brown recalled one occasion where races
ran until 1:30 or 1:45 a.m., claming that an ambulance, which he requires to be
present during races, left the scene and did not return until late.  He also
admitted running past 12:00 a.m. on about five occasions. Since the temporary
injunction, he has implemented procedures for completing races by 11:00 p.m.  He
procured an ambulance that will be available during the races.  Each race ends
within a certain time period, regardless of whether all laps are completed. 
Racers must control their cars to avoid delaying the races and must be on
time.  Brown no longer holds the show for racers who have been rained out at
other tracks or are running late.  Cars are lined up waiting to begin the next
race.  Racers Michael Pitts and James Spear testified that Brown has not
exceeded the time limit and races have been cut short due to time constraints.

Brown has also taken measures to reduce
the noise.  He requires all racers to use a muffler on their cars.  Mufflers
may be packed or equipped with a turn-down, which directs sound towards the
ground, to reduce noise.  Failure to adhere to muffler requirements results in
penalties or disqualification.  Spear has observed Brown enforce the muffler
requirement and has noticed a significant reduction in the noise level at the
track.  Dawn Pitts testified that the mini-sprint racers all use mufflers and
pack the mufflers if the cars are still too loud.  Michael testified that the
track has more restrictions than any other track where he races.   

Brown has also brought in trailer
houses, enlarged the ponds on his property, planted foliage, installed various
barriers around the track, prohibited the use of parts that create excessive
noise, changed the body styles on some cars, and limited the types of cars that
may be raced, all in an effort to reduce the noise.  Chris Kehl, an employee with
O’Reilly Auto Parts, testified that Brown has declined to race certain classes of
cars because of the noise they make.  Brown also plans to install fountains,
require racers to purchase a stall for their cars, and add more bleachers.  He
has already begun building a carport cover along the edge of the property.  

David Cooper, Triolo’s sound expert,
conducted two tests at the Luedke home.  The first test revealed readings of 88
and 89 decibels.  The second test revealed a reading of 90 decibels three different
times during the same race.  These tests were conducted after the temporary
injunction became effective.  Cooper provided the jury with a recording of
various decibel levels.

Cooper also provided opinions regarding
Brown’s noise-reduction measures.  He testified that bodies of water on the
ground will not prevent the noise from traveling.  Fountains will affect higher
frequencies, but not the lower frequencies that travel farther.  Some of
Brown’s barriers, specifically a wooden catch fence and billboards,  vibrate
easily and would not have much impact.  Depending on its depth, foliage could
affect lower frequencies; yet, Cooper was surprised at the noise levels he
received at the Luedke home, given the forest of trees located between the home
and the track.  Turn-downs on the mufflers would probably reduce the sound. 
Brown had reduced some sound, but not that of the race cars.  Cooper testified
that a football stadium berm would reduce the sound a “pretty good bit.”

Several witnesses testified that the
noise has been reduced since the temporary injunction.  Ricky Denman can barely
hear the noise unless the wind blows in a certain direction.  Tim Dockery
testified that the noise has been reduced and is not unreasonable.  Christie Bomnskie
testified that the track is quieter now and races no longer run past 11:00
p.m.  Her three children, who did not reside in the home before suit, are able
to sleep and the noise has never forced her to leave home.  She cannot hear the
noise over the television.  Clifford Crenshaw had signed a petition alleging that
the track is a nuisance.  He now believes the problems have been corrected.  He
has noticed a substantial reduction in noise and barely notices the noise.

Brown testified that the track is
surrounded by industrial buildings, an industrial park, electric building, oil
field with pump jacks that run twenty-four hours a day, airport, livestock
barn, auction barn, highway, and club.  Spear testified that about ten oil-field
businesses operate in the area 24/7.  Denman testified that the highway is
louder than the track.  Dockery testified that an oil well located two
properties to the east of his property is louder than the track and runs 24/7. 
He identified other noises originating from highway traffic and oil-field
trucks.  Boegner testified that she is not bothered by the oil-well noise. 
Luedke testified that he can occasionally hear cows from the livestock barn,
but not at 1:00 a.m.

Michael testified that he has raced at
other tracks that are similarly situated to Hot Rod Hill.  Kehl testified that
the track is essentially the same as the other ten or fifteen tracks he has
visited, i.e., a dirt oval track, and for the most part is similarly
situated to these other tracks.  Michael, Kehl, Spear, Denman, and Bomnskie all
testified that the track is in an appropriate location.  Spear believed that
people would still complain even if Brown moved the track elsewhere.

Brown and other witnesses testified that
the track benefits the community.  Families visit the track for entertainment
and recreation.  They barbecue, visit, and camp-out.  The track does not charge
for camping.  Patrons must adhere to certain behavioral standards and alcohol
is not sold at the track.  School-age drivers must maintain passing grades at school
and proper conduct at home.  When a racer damages another racer’s car, the
racers handle the situation without fighting.  Brown holds a driving school on
Sunday afternoons.  Spear testified that the track provides opportunities for
children to ride in and drive the race cars.  Michael testified that racing has
changed the lives of a couple of young men whom he knows.

The track has also assisted with
charitable events.  Without the track, Spear did not believe that racers would
be able to participate in charitable works and programs.   Michael and his wife
Dawn are members of the Brazos Mini-Sprint Association, which donates money and
participates in benefits and other community events.

Brown testified that racers come from
all over Texas and even out of state.  He testified that the track attracts new
businesses, such as chassis, fabrication, machine, graphics, lettering,
manufacture, design, molds, and fiberglass shops.  Local parts and fuel
businesses sell their products at the track.  A local performance shop provides
pieces, gauges, seats, etc.  Michael testified that out-of-town patrons conduct
business with the locals.  Dockery attends races at the track and testified
that out-of-town patrons spend money at local convenience stores, eat at restaurants,
buy gas, and buy food.  Kehl testified that O’Reilly sponsors events at the
track and will continue to be involved even if it is not actually a sponsor. 
He testified that several national series are interested in racing at the track
and O’Reilly would not sponsor an event that is detrimental either to its business
or to the community.

Michael testified that he is unsure of
whether the Mini-Sprint Association could exist without the track.  Although
the mini-sprint racers race at both Hot Rod Hill and other tracks, Dawn
testified that closing the track could take away the hobby for some members. 
Michael testified that some racers do not want to travel because of the fuel
and traveling more often would increase expenses.

On a good night, the track grosses
$18,000 to $25,000, but Brown does not make a profit because of expenses for
employees, fuel, fire crews, emergency crews, lighting, power, insurance, purse
money, insurance, prizes, gifts, office supplies, and a website.  The track is
a business, not a hobby, and he hopes to eventually make a profit.  It is his
“lifetime dream” and he enjoys working.  He does not race or own a race car. 
He is not certain of what he will do financially if the track is closed.

Analysis 

We first address the harm to Brown.  Triolo
argues that the only harm to Brown is the “loss of uncertain potential
income.”  We disagree.  The injunction will not only interfere with Brown’s own
use and enjoyment of his property, but will also deprive him of his investment
and business.  See Lee, 397 S.W.2d at 925 (suit to enjoin
planned race track involved
the “conflicting rights of two lawful
owners”).  Brown
would certainly suffer some harm as a result of the injunction.

As for harm to the public, Brown presents
three primary reasons explaining why the public benefits from the track’s
existence.  First, he suggests that the track provides a family atmosphere and
influences young racers.  Triolo points to Brown’s testimony at a hearing on
his motion for new trial, wherein he expressed his intent to acquire a beer
license.  However, Brown testified at trial that patrons may bring alcohol to
the track in a certain size cooler.  That alcohol may be served, as opposed to
being brought in by patrons, does not automatically convert the track into a
non-family atmosphere.  Nor does it negate other benefits provided by the track. 
Second, racers have participated in raising money for charitable causes. 
Triolo argues that individual racers, not Brown, raise money for charitable
causes.  Yet, the record contains testimony that the track aided, to some
extent, the racers’ participation in charitable events.  

Third, the track promotes businesses and
attracts racers from both the community and out of town.[2] 
Triolo maintains that the track is not a public necessity and Brown’s evidence
of economic value is not comparable to that in Lee, neither providing an
estimate of economic impact nor testimony from business owners “attributing an
economic impact to the track.”

Lee sued to enjoin a planned race track
and drag strip on Bowles’s property.  See Lee, 397 S.W.2d at 924.  An interstate highway, an air force base, and a few
residences were located in the area.  Id. at 924-25.  Experts testified
that noise from the track would “double the average noise level created by the
highway traffic.”  Id. at 925.  Sounds from airplane jets might be louder
at times, but were “infrequent and of short duration.”  Id.  “[O]rdinary
conversation could not be accomplished on [Lee’s] patio during the races at a
greater distance than one to four feet, and [] sleep would be difficult.”  Id.  “[T]raffic conditions would be very congested.”  Id.  Race cars were not
equipped with mufflers.  See id.  Bowles testified that the
season lasts five months, the track would operate primarily on Saturday nights,
and races would end by 10:00 p.m.  Id. at 926.   

Several witnesses, including three
state representatives, the Sheriff, a hotel manager, and a professional
sports writer, testified that the track would benefit the community.  Id.  The record showed that “automobile racing is the second most popular sport in
the United States from the standpoint of number of paid spectators, and is
gaining in popularity; that this track would help the economy of the area and
stimulate tourist trade; [and] that there were sufficient people in Bexar
County interested in this sport to support a race track.”  Id.  Several residents
testified that the track would “stimulate growth in their area.”  Id.  

The jury found that the track would “substantially
interfere with the reasonable use of [Lee’s] property…”  Id. at 924.  At
a separate hearing, the trial court found that the “contemplated use of
[Bowles’s] property without a drag strip would be a nuisance,” but “the
equities were in favor of [Bowles] and the community.”  Id.  The trial
court permanently enjoined Bowles from “establishing, operating and maintaining
a drag strip upon [his] property,” but denied injunctive relief against the
proposed track.  Id.  The San Antonio Court affirmed the judgment.  See
id. at 927.

Although the evidence of economic impact
in this case may not be as compelling as that in Lee, the record does contain some evidence that
the track has economic value.  Triolo does not point to any place in the
record showing otherwise.  Additionally,
the record shows that the track provides recreational benefits to the
community, such as the driving school, opportunities for children to
participate in the racing experience, recreation for families, improvement of
the lives of young racers, and promotion of groups like the Mini-Sprint
Association.  We cannot say that an injunction closing the track would not cause
some harm to the public.  See
id. at 926-27
(rejecting argument that
balancing test did not apply because Bowles had not shown a public necessity: the
evidence supported a finding that the public generally would benefit from the
track, “both from a standpoint of recreational value and as an economic
asset”).

Brown next contends that the harm to
Triolo is slight in comparison to the harm that he and the public will suffer
if the track is closed, arguing that: (1) the track’s operation will not
destroy Triolo’s home; (2) the noise is not constant, as races take place a few
months each year, once a week, and last no more than six hours; (3) the record
contains no evidence that Triolo’s health was affected; (4) Triolo reaped a
substantial profit from selling property located near the track; and (5) the
jury’s award of only $3,000 to Triolo for loss and enjoyment that occurred over
a two-year period, as well as the disparity between the $10,000 supersedeas bond
for Triolo and the $100,000 bond for Brown, demonstrates that the harm to
Triolo is insignificant.  

In McAfee, the Fort Worth Court considered the harm stemming from a motocross course located on McAfee’s property.  See McAfee, 2008 Tex. App. LEXIS 968, at *2.  The course consisted of two tracks and
ran four days a week from 9:00 a.m. or noon until dusk.  Id. at *1.  The
noise sounded like “thirty chainsaws” and a “bunch of jack hammers,” caused
difficulty having a conversation outside, “prohibited entertaining and reading
outside,” prevented outdoor sports, spooked horses, forced one neighbor to
tranquilize his horse in order to shoe the horse, prevented “outdoor picnic[s]
‘because you couldn’t speak to each other,’” “prevented [one neighbor’s]
grandchildren from fishing and playing outside,” and caused one business owner
to have difficulty working.  Id. at *4-5.  The noise was “so loud that
on four days each week appellees effectively could not use the land outside of
their homes.”  Id. at *9-10.  

Engineer Mike Fann testified that the
types of engines used at the course would “harm the community when the noise
systemically exceeded fifty-five decibels.”  Id. at *5.  Fann concluded
that “twenty or more motorcycles a day on the tracks would exceed the
eighty-five decibel benchmark [identified by section 42.01 of the Penal Code]
‘on a regular basis,’ and one of the loudest bikes would surpass eighty-five
decibels even at a distance of 1422 feet.”  Id.  

The trial court granted a permanent
injunction.  See id. at *1.  On appeal, McAfee raised several
issues, including whether the evidence was legally and factually sufficient to
support the trial court’s balancing of the equities.  Id. at *7.  After
finding that appellees
presented evidence that the course “substantially
interfered with their use and enjoyment of their land by causing unreasonable
discomfort and annoyance,” the Fort Worth Court held that “the trial court
could have concluded that a permanent injunction would cause only slight injury
to McAfee and the public or that such injury would be disproportionate to
appellees’ injuries because of the nuisance.”  Id. at *7-8.  

Here, the evidence similarly
demonstrates that the track
substantially interferes
with Triolo’s use and enjoyment of his property, even if it does not show
either physical harm to Triolo or destruction of Triolo’s home.  Triolo and
other witnesses testified that the noise has been so loud as to drive them from
their homes and cause them to contemplate moving in the event the track remains
open.  See Storey, 226
S.W.2d at 618 (“the law
does not allow one to be driven from his home or compelled to live in
substantial danger or discomfort even though the danger or discomfort is caused
by a lawful and useful business”).  That the track may not always be in
operation does not reduce the harm to Triolo, as witnesses testified that the
noise was constant whenever the track was operating.  See McAfee, 2008 Tex. App. LEXIS 968, at *9-10 (motocross course was “so loud that on four days each week appellees
effectively could not use the land outside of their homes”).  Nor does Triolo’s
profit from the sale of property located near the track negate the interference
caused by the noise from the track.  Triolo testified that he could have
charged approximately $3,000 to $5,000 more per lot if not for the track.  Brown
did not present evidence controverting this testimony.  

Nor are we persuaded that the amount of
the jury’s damages award demonstrates that the harm to Triolo is slight.  The
record simply does not disclose the jury’s rationale for the specific amount
awarded and we will not so speculate.  

As for the bond amounts, Brown testified
at the bond hearing that eighteen months of no racing would cost him $718,810,
an amount based on projected income from the driving school, renting out the
track, attendance, advertisements on t-shirts and fliers, beer and concession
sales, registration fees, and the sale of billboards.  Brown testified that the
track had begun making a profit on the last three nights before it was closed. 
However, the trial court did not have the benefit of this information at the
time the permanent injunction was imposed.  The only such information available
to the trial court at that time came from Brown’s trial testimony that he had
not yet profited from the track, but had lost an unspecified amount of money.   
                    

In summary, the trial court heard
evidence that the track seriously interferes with Triolo’s use and enjoyment of
his property.  See Storey, 226
S.W.2d at 617 (“a lawful
business may become a nuisance in fact when it is operated in such a place or
manner as seriously to interfere with the enjoyment of life and property”).  The
trial court could have concluded that a permanent injunction would cause only
slight injury to Brown and the public or that such injury would be
disproportionate to Triolo’s injuries because of the nuisance.  See McAfee, 2008 Tex. App. LEXIS 968, at *8.

Brown next argues that: (1) Triolo was
not entitled to injunctive relief merely because it is the sole form of relief
requested; and (2) damages would have been an adequate remedy, but Triolo did
not request such damages.  However, the
trial court has discretion
to award injunctive relief where the evidence demonstrates that a nuisance is of a “recurring
nature.”  Holubec
v. Brandenberger, 214
S.W.3d 650, 656 (Tex. App.—Austin 2006, no pet.); see Lamb v. Kinslow, 256 S.W.2d 903, 905 (Tex. Civ.
App.—Waco 1953, writ ref’d n.r.e.) (Where a nuisance is of a “recurring nature,”
an injunction “will lie irrespective of [a] legal remedy at law”).  In such
circumstances, monetary damages are not always adequate because “damages could
be recovered only as of the time of the bringing of the action, and a
multiplicity of suits would be necessary.” Holubec,
214 S.W.3d at 656 (citing Ellen v. Bryan, 410 S.W.2d 463, 465 (Tex. Civ.
App.—Waco 1966, writ ref’d n.r.e.)).

Although Brown plans to self-impose the
time and noise guidelines outlined by the temporary injunction, he does not
intend to stop holding races.  He plans to add more stands and wants to run the
most popular cars, i.e. sprint cars, if the noise can be managed.  He
testified that the car count will increase.  Before suit, he had planned to
conduct some two-day shows and he feels capable of doing so.  

Triolo and others testified that the
noise from the track is constant during its times of operation.  Watkins
testified that, despite the temporary injunction, the track is still “quite
noisy,” forcing her to leave home.  Boegner testified that the noise initially
seemed under control, but became just as loud.  She cannot have a conversation,
entertain guests, sit on the porch, or allow the children to catch fireflies
outside.  She admitted that the noise is not as loud and has been reduced
“somewhat.”  Luedke testified that he still hears noise from the track on
Saturday nights, as well as some Sunday and Tuesday nights.  Denman, Dockery,
Bomnskie, and Crenshaw all testified that the noise level has been reduced.    


Shortly before trial, Triolo filed a
motion for contempt alleging several violations of the temporary injunction:
(1) Deputy Banks was dispatched to the Triolo and Boegner homes where he
measured the noise and received three readings of 87, 92, and 89 decibels
outside the Boegner home, 87 outside the Triolo home, and 65 inside the Triolo
home; (2) Deputy Emig received a reading of 89 to 90 decibels at the home of a
complainant who could not hear his television over the noise; (3) Deputy
Bachman received several complaints, after which he measured the noise levels,
which registered in the low eighties and low sixties; and (4) Cooper’s two
tests revealed readings over 80 decibels.  Brown has received one citation since
the temporary injunction, but claimed that the citation was issued on the first
night of races after the injunction and that the problem was corrected.  However,
Cooper’s testimony shed some doubt as to the ability of Brown’s sound-reduction
measures to sufficiently reduce the noise.  

In light of the evidence, the trial court could have concluded that
the track would continue to constitute a nuisance and that only injunctive
relief would afford Triolo complete relief and prevent the nuisance from
recurring.  See Holubec, 214 S.W.3d at 656.    Conclusion

            Because Triolo presented
evidence that the track interferes with the use and enjoyment of his property
and because that harm is not slight in comparison to the harm to Brown and the
public, the trial court properly balanced the equities and did not abuse its
discretion by granting a permanent injunction.  See Storey, 226
S.W.2d at 619; see also McAfee, 2008 Tex. App. LEXIS
968, at *7-10.  We
overrule Brown’s first issue.           

Restrictiveness
of Injunction

 

In
his second issue, Brown contends that the permanent injunction is more
restrictive and comprehensive than justified by the evidence and usages of
equity.   Triolo argues that Brown failed to preserve this issue for appeal.  We
agree.

To
preserve a complaint for appellate review, the appellant must show that the
complaint was made to the trial court by a timely request, objection, or
motion.  See Tex. R. App. P. 33.1.  In his
motion for new trial, Brown raised issues addressing newly discovered evidence
and the legal and factual sufficiency of the evidence to support the jury’s
findings, but he did not challenge the scope of the permanent injunction.  See id.; see also
Tex. R. Civ. P. 321 (motion for new trial must “briefly refer to
that part of the ruling of the court…or other proceedings which are designated
to be complained of, in such a way that the objection can be clearly identified
and understood by the court”).  

In
his motion for judgment notwithstanding the verdict and to disregard jury
findings, Brown argued that the evidence is legally insufficient to establish
nuisance, the evidence conclusively proves that the benefit of issuing the
injunction outweighs the harm to Brown and the public, any alleged damages were
temporary and/or abated, and the jury’s findings are not supported by the
evidence.  He did not challenge the scope of the permanent injunction in this
motion either.  See Chappell Hill Bank v. Lane Bank Equip. Co., 38
S.W.3d 237, 248 (Tex. App.—Texarkana 2001, pet. denied) (“[B]ecause
the Motion for Judgment N.O.V. did not request the court to grant the motion
for the reasons advanced in this issue on appeal, it did not preserve for
appeal this claimed trial court error”). 
Nor
did Brown
file a motion to modify the injunction.  Accordingly, he has failed to preserve
his second issue for appellate review.  See Tex. R. App. P. 33.1.

We
affirm the trial court’s judgment. 

 

 

FELIPE REYNA

Justice

Before Chief
Justice Gray,

Justice
Vance, and

Justice
Reyna

(Chief
Justice Gray concurring with a note)*

Affirmed 

Opinion
delivered and filed December 3, 2008

[CV06]

 

*           (Note by Chief Justice Gray: “Chief Justice Gray concurs only in the
judgment of the Court to the extent that it affirms the trial court’s
injunction.  A separate opinion will not issue.  He notes, however, that the
Court erroneously states that “the trial court properly balanced the
equities and did not abuse its discretion by granting a permanent
injunction.”  (Emphasis added).  In our review we do not determine whether the
trial court properly balanced the equities.  Our review is limited to whether
the trial court abused its discretion.  Further, I can only hold that the trial
court did not abuse its discretion by granting the permanent injunction.  If
the scope of the issue presented on appeal could properly include the scope of
the injunction, I would conclude that the trial court’s injunction was
overbroad.  The appellant failed to preserve the issue of the scope of the
injunction and therefore the scope of the injunction is not properly before us
for resolution.”)

 









[1]               Brown
argues that the trial court could not consider this evidence because: (1) this
is a suit for private nuisance, for which an injunction is intended to
eliminate harm to Triolo, not the public at large; and (2) the harm to
non-parties, were the injunction denied, is not a proper consideration. 
However, the testimony of non-parties has been considered in injunction suits.  See
McAfee MX v. Foster, No. 02-07-00080-CV, 2008 Tex. App. LEXIS 968, at *4-5 (Tex.
App.—Fort Worth Feb. 7, 2008, pet. denied) (testimony from plaintiffs and two
other neighbors not parties to the suit); see also Estancias Dallas
Corp. v. Schultz, 500 S.W.2d 217, 221-22 (Tex. Civ. App.—Beaumont
1973, writ ref’d n.r.e.) (several neighbors provided testimony similar to that
of the plaintiffs who alleged that an air conditioning unit constituted a
nuisance and should be enjoined).  Nor did Brown object to this evidence.  See
Tex. R. App. P. 33.1.





[2]               Brown
also notes that, at the temporary injunction hearing, the trial court expressed
“no doubt that there is some benefit to this track existing.”